**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN G. BAKER,
Brigadier General, United States Marine Corps,

    *Petitioner*,

    v.

VANCE SPATH
Colonel, United States Air Force, *et al.*,

    *Respondents*.

Civil Action No. 17-CV-2311 (RCL)

**RESPONDENTS' OPPOSITION TO PETITIONER'S SUPPLEMENTAL BRIEF IN
SUPPORT OF PETITIONER'S MOTION FOR HABEAS RELIEF**

CHAD A. READLER
Acting Assistant Attorney General

JENNIFER D. RICKETTS
Director

TERRY M. HENRY
Assistant Branch Director

MICHAEL H. BAER
Trial Attorney (New York Bar No. 5384300)
U.S. Department of Justice,
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone:     (202) 305-8573
Facsimile:     (202) 616-8460
E-mail: Michael.H.Baer@usdoj.gov

*Counsel for Respondents*

## Table of Contents

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

I.      Factual Background ........................................................................................................ 2

II.     Procedural History ......................................................................................................... 8

ARGUMENT ......................................................................................................................... 9

I.      This Court Lacks Jurisdiction Because the Habeas Petition is Moot. ........................... 9

        A.      BGen Baker Bears the Burden of Demonstrating that He Will Be Subject
                to Collateral Consequences. ............................................................................. 10

        B.      The Consequences BGen Baker Identifies Are Insufficient to Support
                Jurisdiction. ...................................................................................................... 14

II.     The Court Should Abstain from Deciding BGen Baker's Petition Because He Has
        Not Exhausted His Remedies in the Military Commission System. ............................. 21

III.    The Decision to Hold BGen Baker in Contempt for Repeatedly Failing to Follow
        a Military Judge's Orders Was Lawful. ....................................................................... 26

        A.      Judge Spath Possessed the Authority to Hold BGen Baker in Contempt. ........... 26

                i.       The MCA Does Not Prohibit Military Judges from Making
                         Contempt Findings. ................................................................................ 28

                ii.      The Procedures in Place for Trying Law-of-War Offenses in
                         Military Commissions Do Not Govern Punishments for Contempt. ........ 33

                iii.     The Secretary of Defense is Entitled to Deference in Interpreting
                         any Ambiguous Procedural Requirements in the MCA. ......................... 35

        B.      The Military Commission Had Personal Jurisdiction over BGen Baker. ............. 37

        C.      BGen Baker's Refusal to Follow Orders Disturbed the Commission's
                Proceedings and Constituted a "Disorder." ....................................................... 39

        D.      BGen Baker Received Adequate Process. .......................................................... 44

CONCLUSION ..................................................................................................................... 45

# Table of Authorities

## CASES

*Arizonans for Official English v. Arizona,*
  520 U.S. 43 (1997) ........................................................................................................... 9

*Carafas v. LaVallee,*
  391 U.S. 234 (1968) ......................................................................................................... 14

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984) ......................................................................................................... 35

*Clarke v. United States,*
  915 F.2d 699 (D.C. Cir. 1990) ......................................................................................... 10

*Coal. of Airline Pilots Ass'ns v. FAA,*
  370 F.3d 1184 (D.C. Cir. 2004) ....................................................................................... 10

*Curry v. Sec'y of Army,*
  595 F.2d 873 (D.C. Cir. 1979) ........................................................................................... 8

*Demore v. Kim,*
  538 U.S. 510 (2003) ......................................................................................................... 32

*Ex parte Robinson,*
  86 U.S. 505 (1873) ........................................................................................................... 40

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ......................................................................................................... 35

*Fox v. Clinton,*
  684 F.3d 67 (D.C. Cir. 2012) ........................................................................................... 35

*Friends of Blackwater v. Salazar,*
  691 F.3d 428 (D.C. Cir. 2012) ................................................................................... 35, 37

*FW/PBS, Inc. v. Dallas,*
  493 U.S. 215 (1990) ......................................................................................................... 12

*\*Gul v. Obama,*
  652 F.3d 12 (D.C. Cir. 2011) .................................................................................... passim

*\*Gusik v. Schilder,*
  340 U.S. 128 (1950) ............................................................................................. 22, 23, 26

*Henry v. Henkel,*
  235 U.S. 219 (1914) ......................................................................................................... 21

*Idema v. Rice*,
   478 F. Supp. 2d 47 (D.D.C. 2007) ................................................................... 14, 15

*In re Al-Nashiri*,
   791 F.3d 71 (D.C. Cir. 2015), *mandamus proceeding*,
   835 F.3d 110 (D.C. Cir. 2016) ........................................................... 22, 24, 25, 26

*In re Al-Nashiri*,
   835 F.3d 110 (D.C. Cir. 2016), *cert denied*, 138 S. Ct. 354 (2017) .............................. 2, 21, 23

*In re Petitioners Seeking Habeaus Corpus Relief in Retaliation to Prior Detentions at
   Guantanamo Bay*,
   700 F. Supp. 2d 119 (D.D.C. 2010), *aff'd sub nom, Chaman v. Obama*,
   No. 10-5130, 2012 WL 3797596 (D.C. Cir. Aug. 10, 2012) ................................... 11

*Justin v. Jacobs*,
   449 F.2d 1017 (D.C. Cir. 1971) ........................................................................ 11

*Lambert v. Blackwell*,
   387 F.3d 210 (3d Cir. 2004) .............................................................................. 26

*Lane v. Williams*,
   455 U.S. 624 (1982) ........................................................................... 14, 15, 16, 19

*Loving v. United States*,
   517 U.S. 748 (1996) .......................................................................................... 36

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................................... 10, 21

*M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*,
   344 F.3d 335 (3d Cir. 2003) .............................................................................. 32

*McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of the Judicial
   Conf. of the U.S.*,
   264 F.3d 52 (D.C. Cir. 2001) ............................................................................ 14

*McNeill v. United States*,
   563 U.S. 816 (2011), *holding appeal in abeyance*, 676 F. App'x 1 (D.C. Cir. 2016).............. 34

*Munaf v. Geren*,
   553 U.S. 674 (2008) .......................................................................................... 22

*Nakell v. Att'y Gen. of N.C.*,
   15 F.3d 319 (4th Cir. 1994) .............................................................................. 15

*Ngiraingas v. Sanchez*,
   495 U.S. 182 (1990) .......................................................................................... 30

*Noyd v. Bond*,
395 U.S. 683 (1969)................................................................................................... *passim*

*O'Sullivan v. Boerckel*,
526 U.S. 838 (1999)........................................................................................................ 26

*Qassim v. Bush*,
466 F.3d 1073 (D.C. Cir. 2006)..................................................................................... 10

*Sacher v. United States*,
343 U.S. 1 (1952)..................................................................................................... 44, 45

*Schlesinger v. Councilman*,
420 U.S. 738 (1975)......................................................................................... 23, 24, 25

*Schlup v. Delo*,
513 U.S. 298 (1995)........................................................................................................ 21

*Seaton v. Kentucky*,
92 F. App'x 174 (6th Cir. 2004).................................................................................... 26

*Sibron v. New York*,
392 U.S. 40 (1968)......................................................................................................... 13

*Spencer v. Kemna*,
523 U.S. 1 (1998)..................................................................................................... *passim*

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016), *as revised* (May 24, 2016)....................................................... 9

*Taylor v. Hayes*,
418 U.S. 488 (1974)................................................................................................. 44, 45

*Transitional Hosps. Corp. of La., Inc. v. Shalala*,
222 F.3d 1019 (D.C. Cir. 2000).................................................................................... 35

*U.S. ex rel. Johnson v. McGinnis*,
734 F.2d 1193 (7th Cir. 1984)....................................................................................... 25

*United States House of Representatives v. Burwell*,
185 F. Supp. 3d 165 (D.D.C. 2016).............................................................................. 34

*United States v. Bartlett*,
66 M.J. 426 (C.A.A.F. 2008)........................................................................................ 36

*United States v. Burnett*,
27 M.J. 99 (C.M.A 1988), *entering judgment*, 27 M.J. 425 (C.M.A. 1988)........................ *passim*

*United States v. Clark*,
  4 F. Supp. 2d 940 (C.D. Cal. 1998) .................................................................... 42

*United States v. Cole*,
  31 C.M.R. 16 (1961) ........................................................................................... 41

*United States v. Ferdinand*,
  29 M.J. 164 (C.M.A. 1989) ................................................................................. 41

*United States v. Kossman*,
  38 M.J. 258 (C.M.A. 1993) ................................................................................. 36

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ............................................................................................ 36

*United States v. Scheffer*,
  523 U.S. 303 (1998) ............................................................................................ 36

*United States v. Wilson*,
  76 M.J. 4 (C.A.A.F. 2017) .................................................................................. 37

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*,
  454 U.S. 464 (1982) ............................................................................................ 12

*Walker v. City of Birmingham*,
  388 U.S. 307 (1967) ............................................................................................ 39

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ............................................................................................ 39

*Zal v. Steppe*,
  968 F.2d 924 (9th Cir. 1992), *as amended* (July 31, 1992) .................................. 15

*Zalawadia v. Ashcroft*,
  371 F.3d 292 (5th Cir. 2004) ............................................................................... 10

## <u>STATUTES</u>

10 U.S.C. § 848 (2006) ...................................................................................... 29, 33

10 U.S.C. § 848 ......................................................................................... 30, 38, 42, 43 44

10 U.S.C. §§ 948a-950t ......................................................................................... 3, 27

10 U.S.C. § 948b ................................................................................................ 33, 34

10 U.S.C. § 948c ...................................................................................................... 38

10 U.S.C. § 948d ...................................................................................................... 38

10 U.S.C. § 948h ................................................................................................... 8

10 U.S.C. § 948q ................................................................................................. 33

10 U.S.C. § 948s ................................................................................................. 33

10 U.S.C. § 949a ........................................................................................ 3, 27, 36

10 U.S.C. § 949m ........................................................................................... 28, 29

10 U.S.C. § 950c ................................................................................................. 24

10 U.S.C. § 950f .................................................................................................. 24

10 U.S.C. § 950g ................................................................................................. 25

10 U.S.C. § 950p ................................................................................................. 34

10 U.S.C. § 950t ............................................................................................ *passim*

10 U.S.C. § 950w (2006) ........................................................................... 28, 29, 32

10 U.S.C. § 1370(a) ............................................................................................ 17

10 U.S.C. § 1565 ................................................................................................. 21

18 U.S.C. § 401 .................................................................................................. 30

28 U.S.C. § 1651 ........................................................................................... 24, 25

Military Commissions Act of 2006,
   Pub. L. No. 109-366, 120 Stat. 2600 ............................................................ 28, 44

Ike Skelton National Defense Authorization Act for Fiscal Year 2011,
   Pub. L. No. 111-383, 124 Stat. 4137 ......................................................... 32, 33, 42

## **OTHER AUTHORITIES**

Captain Gregory E. Maggs, *Judicial Review of the Manual for Courts-Martial*,
   160 Mil. L. Rev. 96 (1999) ........................................................................... 36, 37

W. Winthrop, Military Law and Precedents 307 (2d ed. 1920 Reprint) ................................. 41, 42

Carol Rosenberg, Gitmo judge sends Marine general lawyer to 21 days confinement for
   disobeying orders, *Miami Herald*, Nov. 1, 2017,
   http://www.miamiherald.com/news/nation-
   world/world/americas/guantanamo/article182031196.html ..................................... 19

## INTRODUCTION

Petitioner Brigadier General John G. Baker has filed a petition for writ of habeas corpus to collaterally attack a contempt finding made by Respondent Military Judge Colonel Vance Spath during a military commission proceeding held at United States Naval Station, Guantanamo Bay, Cuba.  Judge Spath held BGen Baker in contempt after he repeatedly refused to comply with two of the commission's orders in open court:  First, BGen Baker, the Chief Defense Counsel for the military commission system, refused to rescind an order that purported to excuse three of the defense attorneys representing the accused in a military commission proceeding overseen by Judge Spath—the prosecution of Abd Al-Rahman Hussayn Muhmmad Al-Nashiri (the alleged mastermind of the U.S.S. *Cole* bombings)—leaving the defendant with no "learned counsel" in his capital case.  Second, BGen Baker refused to take the stand to answer the commission's questions about his decision to permit that excusal.  After concluding that these repeated refusals constituted "disorders that disturbed [the commission's] proceedings significantly," Judge Spath held BGen Baker in contempt and imposed a sentence of 21 days' confinement and a $1,000 fine.

BGen Baker filed his habeas petition a day after Judge Spath held him in contempt.  But the very next day, BGen Baker was released from custody by direction of the military commission's Convening Authority pending review of the contempt finding.  The Convening Authority ultimately upheld the contempt finding but decided to remit the unexecuted portion of the sentence, meaning that BGen Baker no longer faces the prospect of confinement or a fine.  In other words, BGen Baker has already received the relief that he sought in his habeas petition—a release from custody—and his petition is now moot.  The prospect, argued by BGen Baker, that he may be subject to further military processes, and perhaps to future discipline, is not sufficient to establish this Court's habeas jurisdiction.  Those processes (and any future consequences) are

too speculative, and they are at least as likely to be triggered by BGen Baker's underlying conduct—his flouting of military commission orders—as by the contempt finding that BGen Baker seeks to vacate.

Even if this Court had jurisdiction to consider BGen Baker's petition, the Court should abstain from exercising it. BGen Baker was held in contempt by a judge in the military commission system, yet he has not exhausted that system's remedies before bringing this habeas petition. Accordingly, he has run afoul of the rule that "habeas corpus petitions from military prisoners should not be entertained by federal civilian courts until all available remedies within the military court system have been invoked in vain." *Noyd v. Bond*, 395 U.S. 683, 693 (1969).

Finally, even if this Court were to exercise its habeas jurisdiction to review contempt findings from the military commission system, it should uphold Judge Spath's decision as lawful. Judge Spath adhered strictly to the procedures governing contempt determinations in military commissions, and BGen Baker's conduct, which significantly impaired the functioning of the commission, satisfies the statutory definition of contempt.

## BACKGROUND

### I.     Factual Background

BGen Baker was held in contempt during military commission proceedings for the ongoing criminal prosecution of Abd Al-Rahman Hussayn Muhmmad Al-Nashiri ("Al-Nashiri"). Al-Nashiri "is the alleged mastermind of the bombings of the U.S.S. *Cole* and the French supertanker the M/V *Limburg*, as well as the attempted bombing of the U.S.S. *The Sullivans*." *In re Al-Nashiri*, 835 F.3d 110, 113 (D.C. Cir. 2016) ("*Al-Nashiri II*"), *cert. denied* 138 S. Ct. 354 (2017). These attacks killed seventeen U.S. sailors, injured dozens of other people, and caused hundreds of millions of dollars in property damage. *See* Decl. of Colonel John B. Wells ("Wells Decl.") ¶ 13

(attached as Exhibit 1).   Al-Nashiri is charged with multiple violations of the Military Commissions Act of 2009 ("MCA" or "2009 MCA"), 10 U.S.C. §§ 948a-950t, including terrorism, murder in violation of the law of war, and attacking civilians.  *See* Wells Decl. ¶ 13.  The charges carry the possible punishment of death.  *Id.*

The current military commission proceedings against Al-Nashiri were initiated in September 2011.  *See id.* ¶14.[1]  Al-Nashiri is represented in the proceedings by, among others: Richard Kammen, a civilian attorney with experience handling capital cases who has served as "learned counsel"[2] for Al-Nashiri since 2008; U.S. Navy Lieutenant Alaric Piette, a detailed military defense attorney; and Rosa Eliades and Mary Spears, who are both civilian attorneys employed by the Department of Defense.  Wells Decl. ¶¶ 15-17

The precipitating events that led to BGen Baker being held in contempt began on October 6, 2017.  Mr. Kammen, Ms. Eliades, and Ms. Spears—*i.e.*, Al-Nashiri's three civilian defense attorneys—submitted requests to BGen Baker to withdraw from representing Al-Nashiri.  Wells Decl. ¶ 28.  The request was based on the attorneys' stated belief that continued representation of Al-Nashiri would violate their respective states' rules of professional responsibility due to alleged intrusions by the Government into their attorney-client communications.  *See id.* ¶¶ 26, 28.  The withdrawal request was accompanied by an advisory ethics opinion from Professor Ellen Yaroshefsky of Hofstra University School of Law, but did not include any opinions from the

---

[1] Al-Nashiri was initially charged in late 2008 under the 2006 predecessor statute to the current MCA, but those charges were dismissed without prejudice in early 2009.  *See* Wells Decl. ¶ 14.

[2] The MCA provides that the accused has the right to be represented by appointed military counsel, as well as "to the greatest extent practicable, by at least one additional counsel who is learned in applicable law relating to capital cases and who, if necessary, may be a civilian and compensated in accordance with regulations prescribed by the Secretary of Defense."  10 U.S.C. § 949a(b)(2)(C)(ii).

attorneys' respective bar authorities concerning their alleged ethical conflicts.  *Id.*  On October 11,

2017, BGen Baker issued a memorandum purporting to excuse the three attorneys for "good cause"

under rule 505(d)(2) of the Rules for Military Commissions ("R.M.C."),[3] the rule governing

changes of defense counsel.  Wells Decl. ¶ 29.

Two days later, LT Piette (detailed military counsel for Al-Nashiri) filed notices of the

three attorneys' purported excusal, along with Professor Yaroshefsky's ethics opinion, before the

military commission.  *Id.* ¶ 30.  These October 13, 2017 filings were the first instances of Al-

Nashiri's defense counsel attempting to withdraw based on the purported authority of the Chief

Defense Counsel to excuse counsel unilaterally.  *Id.* ¶ 31.  Defense counsel previously had sought

the military commission judge's approval before excusing other defense team members.  *Id.*

On October 16, 2017, LT Piette filed a motion to abate the proceedings against Al-Nashiri

pending the appointment of new learned counsel to replace Mr. Kammen.  Wells Decl. ¶ 32.  The

motion included representations that Mr. Kammen and the two other civilian attorneys would not

attend or represent Al-Nashiri at the next scheduled hearing session, set for October 30 –

November 17, 2017, and would not conduct other legal business on behalf of Al-Nashiri.  *See id.*

¶ 33.  That same day, Judge Spath issued an order calling for expedited briefing on the motion to

abate.  *Id.* ¶ 34.  The order stated that he had "not found 'good cause'" to excuse the three civilian

attorneys.  *Id.*

On October 27, 2017, after receiving briefing from the Prosecution and BGen Baker on the

excusal issue, Judge Spath rejected Al-Nashiri's argument and confirmed that excusal of defense

counsel for good cause must be accomplished by the military judge on the record.  *Id.* ¶ 37.  He

---

[3] The rules are located in Part II of the Manual for Military Commissions (2016), available at
http://www.mc.mil/Portals/0/pdfs/2016_Manual_for_Military_Commissions.pdf.

determined that reading R.M.C. 505(d)(2)(B) to vest the excusal power with the military judge would avoid "conflict with other provisions within the R.M.C." or "directly prejudic[ing] the Accused," and it would accord with "federal and state cases and rules" that "appear to universally stand" for the proposition that "[a] trial judge determines whether there is good cause to warrant withdrawal of counsel" after appearances have been made. *Id.* Judge Spath also found that "no good cause exists to warrant the excusal of Learned Counsel or the two DoD civilian defense counsel from their duties to represent [Al-Nashiri]." *Id.* ¶ 38. In particular, Judge Spath found that "no evidence has been presented to demonstrate intrusions [into the attorney-client relationship] in this case affecting this Accused which would ethically require the withdrawal or disqualification of Learned Counsel." *Id.*[4] Judge Spath, therefore, denied the motion to abate. *Id.*

Notwithstanding Judge Spath's findings and orders, BGen Baker did not rescind his purported excusal, and Mr. Kammen, Ms. Eliades, and Ms. Spears failed to travel to Guantanamo in advance of the November 2017 hearing session. Wells Decl. ¶ 39. On October 31, 2017, the first day of the hearing session, Judge Spath stated pertinent findings on the record, including the following: "One, no good cause exists to warrant the excusal of Mr. Kammen, Ms. Eliades or Ms. Spears. Two, no evidence has yet been presented to demonstrate intrusions in this case affecting this accused which would ethically require withdrawal or disqualification of outside appointed learned counsel. And three, the excusal of outside appointed learned counsel at this stage would prejudice Mr. al Nashiri's due process rights." *Id.* ¶ 40.

After making these initial findings, Judge Spath called BGen Baker as a witness to examine the reasons for the absence of the three civilian attorneys and to "get to some of the questions [he]

---

[4] In reaching this decision, Judge Spath was aware of the classified information allegedly giving rise to the three civilian attorneys' purported withdrawals. Wells Decl. ¶ 38 n.5.

need[ed] answered so [the commission] can move forward." *United States v. Al Nashiri,* Unofficial/Unauthenticated Transcript ("Tr.") at 10028-29[5]; *see also* Wells Decl. ¶ 41. BGen Baker categorically asserted privilege and refused Judge Spath's order to take the witness stand. Tr. at 10039. Judge Spath explained, however, that while BGen Baker was free to assert privilege in response to individual questions—and could take time to consult with other attorneys if need be—he did not have "an absolute right not to testify." *Id.* at 10038-39. Judge Spath had noted earlier in the preceding that, to the extent BGen Baker disagreed with the decision requiring him to testify, he could "go file a writ and . . . attempt to get a stay," rather than disobey the order. *Id.* at 10032. Judge Spath accordingly repeated his order to BGen Baker to testify, but BGen Baker again refused. *Id.* at 10040. After additional back-and-forth, Judge Spath repeated his order to BGen Baker for a third time, and for a third time, BGen Baker refused to comply. *Id.* at 10042.

Judge Spath next turned to the issue of the three defense attorneys BGen Baker had purported to excuse. The Judge ordered BGen Baker "to rescind the direction you gave" excusing the three attorneys, and BGen Baker indicated that he was refusing to comply with that order as well. *Id.* at 10042. Judge Spath then instructed BGen Baker "to send [the attorneys] a memo telling them their withdrawal is not approved," to which BGen Baker replied "[o]h, I'm definitely not going to . . . I am definitely not . . ." *Id.* at 10042-43.[6] BGen Baker repeated that he "refuse[d]

---

[5] Transcripts of the commission proceedings from October 31, 2017, and November 1, 2017, are attached to the Wells Declaration as Attachments B and C, respectively.

[6] BGen Baker characterizes his conduct during these proceedings as "exceedingly courteous" and his disagreement with Judge Spath as "respectful[]." *See* Suppl. Br. in Supp. of Pet'r's Mot. for Habeas Relief ("Suppl. Br.") 22. That is not consistent with the recollection of Col. Wells, who witnessed BGen Baker's conduct and cannot recall comparable behavior by an attorney in military or civilian court. *See* Wells Decl. ¶¶ 43-45. Prosecutors in the commission proceeding have requested the audio from these proceedings from the commission and, should the audio become available, Respondents could supply it to the Court as needed. *See id.* ¶ 47.

to follow th[e] order" rescinding the excusal. *Id.* at 10043. Judge Spath accordingly indicated that he "anticipate[d] we are going to have a contempt hearing" the next day. *Id.* at 10046.

The following day, November 1, 2017, Judge Spath conducted summary contempt proceedings against BGen Baker under R.M.C. 809, which permits summary proceedings where the judge has witnessed the offending conduct in question. *See* Tr. at 10052. Judge Spath stated for the record the underlying facts concerning BGen Baker's refusal to comply with two orders the preceding day. *Id.* at 10053-63. BGen Baker repeatedly attempted to interrupt the Judge's recitation of the facts to make arguments about the contempt proceeding, despite Judge Spath's reminder that it was "a summary proceeding." *Id.* at 10053-55. When he was able to continue, Judge Spath explained that although the contempt determination was "a difficult, unpleasant decision," it was "an affront to the process of justice" that the determination was necessary. *Id.* at 10055-56. He found that BGen Baker "refused to obey the commission's order to testify" and that he "willfully refused to obey the commission's order to rescind [the] excusal of counsel." *Id.* at 10062. Moreover, he concluded that these refusals "caused a significant disorder to the [commission's] process" and that they each "constituted . . . disorders that disturbed these proceedings significantly." *Id.* at 10063-64. As such, he found BGen Baker in contempt for both of his refusals to comply with the commission's orders. *Id.* Judge Spath sentenced BGen Baker to 21 day's confinement and fined him $1,000. *Id.* at 10072.

Following the contempt proceedings, and BGen Baker's refusal to rescind his excusal of Mr. Kammen, Ms. Eliades, and Ms. Spears, the three civilian attorneys did not appear (in person or remotely) for any of the November 2017 hearings of the commission. Wells Decl. ¶ 48. Their absences, and LT Piette's refusal to participate in the case without learned counsel present, caused significant disruption to the military commission proceedings. *Id.* Every witness for the

November hearing had to be rescheduled. *Id.* Further, in Mr. Kammen's absence, LT Piette declined to examine a witness who traveled from Qatar to Guantanamo Bay at the request of Mr. Al-Nashiri's defense team to testify about various issues related to a motion to suppress filed by Mr. Al-Nashiri. *Id.* LT Piette also declined to cross-examine a cooperating witness who may be transferred to foreign custody after February 2018. *Id.* These actions and inactions resulted in significant gaps in the proceedings, as some days were completely devoid of court activity. *Id.* More broadly, LT Piette has refused to take a position on most matters before the commission, including straightforward evidentiary motions, citing the absence of a learned counsel to supervise the defense case. *Id.* Judge Spath has described the situation as "disorder and havoc." *Id.*

## II.     Procedural History

On November 2, 2017—the day after the summary contempt proceeding—BGen Baker filed the petition for writ of habeas corpus at issue here. Pet. for Writ of Habeas Corpus ("Pet."), ECF No. 2. The Court heard oral argument on the petition on the same day and scheduled another hearing for November 3. *See* Minute Entry for Proceedings (Nov. 2, 2017). On the morning of November 3, Harvey Rishikof, who serves as the Convening Authority for military commissions,[7] deferred the remaining term of BGen Baker's confinement pending a final decision by the Convening Authority on the sentence and finding of contempt.[8] Suppl. Br., App. I, ECF No. 11-

---

[7] In his capacity as Convening Authority, Mr. Rishikof is responsible for the overall management of the military commissions process, including logistics and personnel support. The Convening Authority is authorized to, among other things, convene military commissions, refer charges to trial, negotiate pre-trial agreements, and review records of trial. *See, e.g.*, 10 U.S.C. § 948h. The Convening Authority for military commissions under the MCA serves a similar function as the convening authority for courts-martial under the Uniform Code of Military Justice. *See Curry v. Sec'y of Army*, 595 F.2d 873, 875-76 (D.C. Cir. 1979) (summarizing the role of the convening authority in the court-martial process).

[8] Pursuant to R.M.C. 809(e), the fine had not yet become effective because it had not been "ordered executed by the convening authority."

11; *see also* R.M.C 809(d) (procedures for Convening Authority's review of contempt); R.M.C. 1101(c) (authorizing Convening Authority to defer sentence or fine).   At the hearing this Court scheduled on November 3, the Court ultimately agreed to withhold a decision for a reasonable time pending a final decision by the Convening Authority.

As part of the Convening Authority's review of the contempt finding, BGen Baker was invited to file written materials, including any allegations of error.  Suppl. Br., App. I.  BGen Baker subsequently filed a detailed submission with the Convening Authority, which included the five principal arguments he makes here challenging the contempt finding.  *Compare* Suppl. Br., App. K, ECF No. 11-13, *with* Suppl. Br.  On November 21, 2017, the Convening Authority issued a final decision that affirmed the findings of contempt as "correct in law and fact."  *See* Mem. from Convening Authority Re: Action on Contempt Proceedings ("CA Mem.") at 1 (attached as Appendix L to BGen Baker's Supplemental Brief, ECF No. 11-14).  But the Convening Authority also decided to "remit the unexecuted confinement term and the fine."  *Id.*

On December 1, 2017, BGen Baker filed a Supplemental Brief in support of his petition, arguing, *inter alia*, that this Court still has jurisdiction to resolve the petition.  *See* Suppl. Br. 9-16.

## ARGUMENT

### I.     This Court Lacks Jurisdiction Because the Habeas Petition is Moot.

At the outset, this Court lacks jurisdiction over BGen Baker's habeas petition because the petition is moot.  The Constitution "confers limited authority on each branch of the Federal Government," and Article III limits the judicial power to "Cases" and "Controversies."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546-47 (2016), *as revised* (May 24, 2016).  This requirement applies at "all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal citation omitted).  Accordingly,

"[e]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (internal citation omitted).  Mootness is a "threshold jurisdictional issue." *Coal. of Airline Pilots Ass'ns v. FAA*, 370 F.3d 1184, 1189 (D.C. Cir. 2004).

BGen Baker has received all of the relief he has sought in his petition—he has been released from confinement pursuant to the Convening Authority's decision to remit the unexecuted portion of his sentence.  *See* CA Mem. at 10; *see also* Pet. at 16 (seeking only "immediate release" as a remedy).  As such, this Court can exercise jurisdiction over his petition only if he demonstrates "that his subsequent release has not rendered the petition moot."  *Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006) (quoting *Zalawadia v. Ashcroft*, 371 F.3d 292, 297 (5th Cir. 2004)).  To do so, BGen Baker, at a minimum, must identify a "concrete and continuing injury other than the now-ended [confinement]," *i.e.*, "some 'collateral consequence'" of the contempt finding.  *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  BGen Baker has failed to do so.  First, he incorrectly contends that this Court can assume the existence of jurisdiction-conferring collateral consequences, instead of requiring BGen Baker to demonstrate them.  Second, the specific consequences he attempts to identify are too speculative to sustain jurisdiction, and they depend on the underlying conduct that caused Judge Spath to hold BGen Baker in contempt, rather than the contempt determination itself.

### A. BGen Baker Bears the Burden of Demonstrating that He Will Be Subject to Collateral Consequences.

As "[t]he party invoking federal jurisdiction," BGen Baker "bears the burden of establishing" that his petition satisfies the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also In re Petitioners Seeking Habeas Corpus*

*Relief in Relation to Prior Detentions at Guantanamo Bay*, 700 F. Supp. 2d 119, 129 (D.D.C. 2010) (habeas "petitioner bears the burden of establishing . . . collateral consequences"), *aff'd sub nom. Chaman v. Obama*, No. 10-5130, 2012 WL 3797596 (D.C. Cir. Aug. 10, 2012).

BGen Baker seeks to minimize that burden by pointing to a presumption of collateral consequences that the Supreme Court has recognized in other, limited contexts.  Suppl. Br. 9-10. Specifically, when a habeas petitioner challenges the validity of a state- or federal-court conviction, the Supreme Court (reluctantly) has "been willing to presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur)."  *Spencer*, 523 U.S. at 8; *see also id.* at 10 (describing the presumption as sitting "uncomfortably beside" longstanding jurisdictional principles).  The Supreme Court, however, "has cautioned against extension of the presumption of collateral consequences."  *Gul v. Obama*, 652 F.3d 12, 16 (D.C. Cir. 2011).[9]   And recently, the D.C. Circuit declined to find that the presumption applied when detainees who had been held at the Naval Base at Guantanamo Bay (but were subsequently released from confinement) petitioned for writs of habeas corpus.  *Id.* at 17. This Court similarly should decline to expand the collateral-consequences presumption to encompass contempt findings in military commissions.

In *Spencer*, the Supreme Court declined "to presume that collateral consequences adequate to meet Article III's injury-in-fact requirement" would result from a parole revocation order.  523 U.S. at 14.  The Court offered three reasons in support of that conclusion—reasons the *Gul* court

---

[9] More than two decades before the Supreme Court decided *Spencer*, the D.C. Circuit applied a presumption of collateral consequences in a case where a habeas petitioner had been "commit[ted] as a sexual psychopath."  *Justin v. Jacobs*, 449 F.2d 1017, 1019-20 (D.C. Cir. 1971).  The *Justin* court's view—that it could "perceive no reason" not to extend the presumption to the petitioner's challenge to his commitment—accordingly lacked the benefit of the Supreme Court's subsequent cautionary guidance.  *See id.*

adhered to closely in declining to extend the presumption, *see Gul*, 652 F.3d at 17, and that apply with force here.  First, "the practice of presuming collateral consequences . . . sits uncomfortably beside the 'long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.'"  *Spencer*, 523 U.S. at 10-11 (quoting *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231 (1990)).  In fact, the *Spencer* Court described the presumption as an "abandonment" of the Court's "fastidious approach to collateral consequences," which had required an individual to identify "only concrete disadvantages or disabilities that had in fact occurred, that were imminently threatened, or that were imposed as a matter of law."  *Id.* at 8-9.  The Supreme Court accordingly has recognized there is significant tension between a presumption of collateral consequences and Article III jurisdiction over a habeas petition.  *See id.* at 9-14.  And that reasoning is "always applicable to a claim that collateral consequences should be presumed rather than proved."  *Gul*, 652 F.3d at 17.

Second, the *Spencer* Court emphasized that "[t]he practice of presuming collateral consequences developed during an era in which it was thought that the only function of the constitutional requirement of standing was to assure that concrete adverseness which sharpens the presentation of issues."  523 U.S. at 11 (citation omitted).  In subsequent years, however, the Court acknowledged that the standing requirement of Article III helps define "the role assigned to the judiciary in a tripartite allocation of power."  *Id.* (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 474 (1982)).  In other words, courts now recognize "the case-or-controversy requirement" as "a bulwark supporting the separation of powers."  *Gul*, 652 F.3d at 17.  And in *Gul*, the D.C. Circuit declined to apply the presumption to released Guantanamo Bay detainees—who were by then "in the custody of a foreign sovereign"— in light of the risk of infringing on the political branches' foreign relations powers.  *Id.*  Applying

the presumption here, in the context of an Article I military commission, would risk a similar infringement, given the "substantial degree of civilian deference [owed] to military tribunals." *Noyd v. Bond*, 395 U.S. 683, 694 (1969); *see also id.* (emphasizing that the military justice system involves "a legal tradition which is radically different from that which is common in civil courts").

Third, the Court in *Spencer* relied on the "obvious fact" that "most criminal convictions do in fact entail adverse collateral legal consequences," whereas it was less clear that such a presumption would "comport with reality" in the context of parole revocation. *Spencer*, 523 U.S. at 12 (quoting *Sibron v. New York*, 392 U.S. 40, 55 (1968)). Applying that principle in *Gul*, the D.C. Circuit noted that it had "no basis for inferring" that "detention at Guantanamo and designation as an enemy combatant . . . routinely have collateral consequences." 652 F.3d at 17. There similarly is no basis for such an inference here. Whatever expertise Article III courts have in inferring collateral consequences from run-of-the-mill criminal convictions, that expertise is lacking in the context of Article I military commissions. That is particularly true in this case, given that the statute authorizing the military commission at issue was enacted less than a decade ago, in 2009. *Cf. Gul*, 652 F.3d at 17 (highlighting that holding detainees at Guantanamo and designating them enemy combatants "are recent phenomena").

Additionally, the alleged collateral consequences BGen Baker points to reinforce that any consequences of a contempt finding in a military commission are not sufficiently "obvious" so as to be presumed.[10]   Nearly all of the consequences relate to the military's particular system for discipline and, as discussed in greater depth below, hinge on speculative future determinations.

---

[10] BGen Baker's decision to submit a declaration outlining "different and yet overlapping administrative processes" (that he allegedly will face) reinforces that any consequences resulting from those processes are not so certain or "obvious" from the face of governing statutes or regulations as to warrant a presumption of jurisdiction. *See* Decl. of Stephen C. Newman ("Newman Decl.") ¶ 11, ECF No. 11-17 (Suppl. Br., App. O).

*See, e.g.*, Suppl. Br. 10 (discussing an "ethics review"); *id.* at 12 (noting that "contempt finding alone *could* result in Petitioner's loss of . . . increased retirement pay . . . *if* [the contempt finding] were used to find that his service as a brigadier general was not satisfactory" (emphasis added)); *see also infra* at 14-21. These kinds of consequences are a far cry from the clear statutory directives that traditionally have triggered the presumption of collateral consequences. For instance, in *Carafas v. LaVallee*, 391 U.S. 234, 237 (1968), the Supreme Court held that a habeas petitioner's case was not moot because, by virtue of his burglary and grand larceny conviction, and by operation of New York and federal law, "he cannot engage in certain businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; [and] he cannot serve as a juror." *Id.* at 235, 237 (footnotes omitted).

In sum, the presumption of collateral consequences should not be extended in a constitutionally unsound manner to a new and unfamiliar context. Instead, BGen Baker should be required to meet the typical demands of Article III by making "an actual showing" that his contempt finding "burdens him with 'concrete injuries.'" *Gul*, 652 F.3d at 17.

### B. The Consequences BGen Baker Identifies Are Insufficient to Support Jurisdiction.

BGen Baker's efforts to identify collateral consequences sufficient to establish this Court's jurisdiction are unavailing. To prevent his habeas case from becoming moot, those consequences must be the "tangible, concrete" result of the contempt finding and must be "susceptible to judicial correction." *McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of the Judicial Conf. of the U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001). More specifically, the consequences must be "'civil disabilities' imposed . . . . by operation of law." *Idema v. Rice*, 478 F. Supp. 2d 47, 52 (D.D.C. 2007) (quoting *Lane v. Williams*, 455 U.S. 624, 632 (1982)). "[N]on-statutory consequences," such as adverse effects on "employment prospects," are insufficient. *Lane*, 455

U.S. at 632 (holding that felons who had been sentenced to mandatory parole, violated that parole, and had served all of the resulting sentence, could not invoke habeas jurisdiction to challenge the trial court's failure to advise them of the mandatory parole requirement before they pleaded guilty). So, too, are consequences that hinge on "discretionary decisions," particularly when such decisions "may take into consideration . . . the underlying conduct that formed the basis" of the conviction. *Id.* at 632-33. Such consequences are not the necessary, legally prescribed result of a conviction, and are thus "too speculative to sustain the exercise of federal jurisdiction." *Gul*, 652 F.3d at 18.

Applying these principles in *Idema v. Rice*, 478 F. Supp. 2d at 51-52 (Sullivan, J.), another Judge of this Court found that "non-statutory consequences," such as damage to a petitioner's professional reputation and denial of parental visitation rights, did not amount to legally cognizable collateral consequences that would allow the habeas petitioner in that case to continue challenging his alleged unlawful detention in Afghanistan. The Court reasoned that the alleged adverse consequences were "based on the discretionary decisions of employers or judges and [were] not legally prescribed consequences of incarceration" that were "imposed by state or federal law."[11] *Id. at 52.*

As in *Idema*, the consequences BGen Baker identifies are insufficient to establish jurisdiction. First, BGen Baker emphasizes that, in the wake of his contempt finding, he has been referred to the appropriate authorities in the Navy and the Marine Corps for an ethics review.

---

[11] A few courts from outside this circuit have found the risk of professional consequences stemming from a contempt finding sufficient for jurisdiction. *See Nakell v. Att'y Gen. of N.C.*, 15 F.3d 319, 323 (4th Cir. 1994) (holding "possibility" of state-bar grievance was "an additional collateral consequence preventing mootness"); *Zal v. Steppe*, 968 F.2d 924, 926 (9th Cir. 1992), *as amended* (July 31, 1992) (finding the "risk[] [of] being disciplined" sufficient). But these cases preceded the Supreme Court's decision in *Spencer* and, because they involved criminal convictions in state or federal court, were subject to a presumption of collateral consequences.

Suppl. Br. 10; *see also* CA Mem. at 10.  Such a review is not itself a "civil disabilit[y],"[12] *Lane*, 455 U.S. at 632, but BGen Baker speculates that any number of disabilities *could* result from an ethics-review process.  *See* Suppl. Br. 11-12 (detailing a chain of consequences—including suspension from practice, referral to civilian licensing authorities, removal from BGen Baker's current position, and separation from the U.S. Marine Corps—that all hinge on discretionary sanctions from the Judge Advocate General ("JAG")); *see also* Newman Decl. ¶ 19 (describing "the *possible* sanctions" BGen Baker faces (emphasis added)).  All of these hypothetical consequences are insufficient to establish jurisdiction.  They would kick in only after a lengthy process, where decision-makers had significant discretion, and where BGen Baker's underlying conduct—rather than the contempt finding itself—would likely be at issue.

Specifically, the ethics review that BGen Baker points to would include at least the following steps prior to final disciplinary action: an initial review of the ethics complaint; an initial notice of the complaint to BGen Baker and opportunity to comment; a further review by the cognizant Rules Counsel; an ethics investigation in which BGen Baker would have, *inter alia*, the right to request a hearing, the right to inspect and present evidence, the right to call witnesses, and the right to be assisted by counsel; the preparation of a report summarizing the evidence (which could include a recommendation that the case be closed); a review of the report by the Rules Counsel; and, only "[i]f the Rules Counsel believes . . . that professional disciplinary action greater than corrective counseling is warranted," a referral to the JAG.  JAGINST 5803.1E, Enclosure (2), ¶¶ 5-6, 8.  But even if that referral takes place, "[t]he JAG is not bound by the recommendation

---

[12] In fact, an ethics complaint can be summarily dismissed—without the attorney who was the subject of the complaint even knowing that it was filed—if the complaint fails to establish probable cause that an ethics violation occurred.  *See* JAGINST 5803.1E, Enclosure (2), ¶ 5.b(1), available at http://www.jag.navy.mil/library/instructions/JAGINST_5803-1E.pdf.

rendered." *Id.* ¶ 10.a.   Instead, he retains "sole *discretion*" to "take such action as the JAG considers appropriate." *Id.* ¶ 10.c. (emphasis added).   And if the JAG were to decide to impose professional repercussions on BGen Baker, such "adverse 'discretionary decision[s]' are not 'collateral consequences'" of contempt findings.   *Gul*, 652 F.3d at 20 (alteration in original) (quoting *Spencer*, 523 U.S. at 16).

Moreover, the purpose of any ethics review process is "to determine whether, by clear and convincing evidence, . . . the questioned *conduct* occurred and, if so, whether . . . such *conduct* constitutes a violation of the Rules or the Code of Judicial Conduct." JAGINST 5803.1E, Enclosure (2), ¶ 8.a. (emphasis added).   An order vacating the contempt finding would not change anything about the nature of the underlying conduct—*i.e.*, BGen Baker's repeated refusal to follow Judge Spath's orders.   As such, a potential adverse ethics determination is not redressable because "it is at least as likely that the conduct underlying the [contempt finding], rather than the [contempt finding] itself . . . would be used" to reach such a determination.   *Spencer*, 523 U.S. at 16.   Thus, for multiple reasons, a referral for an ethics review is not a sufficient collateral consequence.

The second consequence BGen Baker identifies is the possibility of losing the increased retirement pay that comes with his service as a brigadier general.   Suppl. Br. 12, 14.   That possibility would only be triggered, however, following a determination that "his service . . . was not satisfactory." *Id.*; *see also* 10 U.S.C. § 1370(a) (setting retirement pay at "the highest grade in which [the officer] served on active duty satisfactorily, as determined by the Secretary of the military department concerned").   BGen Baker has provided nothing to suggest that a satisfactory-service determination is anything other than a discretionary choice.   To the contrary, the only information BGen Baker provides is that the determination rests "exclusively [with] the Secretary of the Navy" and that, prior to any determination, BGen Baker would be given notice and the

opportunity to be heard—both of which are characteristics of discretionary processes. *See* Newman Decl. ¶ 17 (citing SECNAVINST 1920.6C). Additionally, BGen Baker has not established that the Secretary of the Navy would base any hypothetical adverse characterization of his service on the fact of the contempt finding, rather than on BGen Baker's underlying failure to comply with the military judge's orders. *See Spencer*, 523 U.S. at 16. He accordingly has not met his burden in establishing that a decrease in retirement pay is a collateral consequence that will result from his contempt finding.

BGen Baker's third alleged consequence is that he must be reported in the Officer Disciplinary Notebook (ODN) system. Suppl. Br. 13. The ODN is a database that tracks reports of officer misconduct. *See* Marine Corps Order ("MCO") P5800.16A ¶ 4003.1.[13] An entry in that database is not itself an adverse collateral consequence, particularly given that ODN entries are not included in an officer's official military personnel file. *See id.* Even assuming it were an adverse collateral consequence, BGen Baker being reported in the ODN is not—by BGen Baker's own admission—a consequence this Court can redress. *See* Newman Decl. ¶ 12 ("[A]n officer entry [in the ODN] is never removed."). In fact, even if an ODN entry could be removed, the relevant regulation would appear to require an entry for BGen Baker regardless of whether his contempt finding is vacated. Such an entry is necessary if there is "credible information" that a Marine officer has been "[i]nvolved in an incident, or alleged, suspected, or reported to have committed misconduct that has generated . . . media interest." MCO 5800.16A, ¶¶ 4300.2, 4300.3. That standard likely was met after Judge Spath first made his contempt finding—which constitutes more than just an allegation of misconduct—given the level of media interest. *See, e.g.*, Carol

---

[13] Available at
http://www.marines.mil/Portals/59/MCO%20P5800.16A%20W%20CH%201-7.pdf.

Rosenberg, Gitmo judge sends Marine general lawyer to 21 days confinement for disobeying orders, *Miami Herald*, Nov. 1, 2017, http://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article182031196.html.  There is thus no basis for treating the ODN entry as a redressable collateral consequence.

To be sure, BGen Baker again identifies certain derivative consequences that he claims may flow from the ODN entry.  Suppl. Br. 13.  But he provides no reason why, if the entry in the ODN is not removable (and would have been required in any event), any of those derivative consequences are traceable to the contempt finding he seeks to vacate or redressable by this Court.  Moreover, the alleged derivative consequences—including a "decision as to whether [BGen Baker] should be required to show cause to remain on active duty" and the convening of a Board of Inquiry, *id.*—are inadequate for the same reasons described above.  Namely, they involve discretionary decisions in which BGen Baker's underlying refusal to follow orders is likely to be considered.

The fourth alleged collateral consequence is the submission of an adverse fitness report.  Suppl. Br. 13.  BGen Baker argues that such a report, if issued, would remain in BGen Baker's file and would be considered when decisions are made about his career, such as possible promotions and future assignments.  *Id.*  But the Supreme Court has already held that the possibility of such effects is insufficient to sustain jurisdiction over a habeas petition.  *Spencer*, 523 U.S. at 13 (case is moot when the consequences of a conviction are filtered through the "discretionary decisions . . . made by an employer" (quoting *Lane*, 455 U.S. at 632-33)).  And the decision whether to initiate an adverse fitness report in the first place would be made by BGen Baker's reporting official, with BGen Baker having the opportunity to submit rebuttal materials before any report is

finalized. *See* MCO 1610.7, Ch. 4, ¶ 15, Ch. 5, ¶ 3.[14]   Moreover, BGen Baker again fails to show

why, even if the alleged consequences related to an adverse fitness report were sufficient, he would

not suffer them anyway (if at all) by virtue of his conduct. *See id.*, Ch. 5, ¶ 1.c(2) (defining

"adversity" for adverse fitness reports to include "not meet[ing] the [reporting senior's]

expectations" and "not accomplish[ing] the requirements of [the officer's] assigned billet").   He,

therefore, has failed to meet his burden with respect to this consequence as well.

All of the remaining consequences BGen Baker mentions in his brief have either been

addressed above (the consideration of adverse information for promotions and the possible

decrease of BGen Baker's retirement grade) or are linked to one of the already-contingent

consequences discussed above (reduction of BGen Baker's grade to colonel). *See* Suppl. Br. 14.[15]

---

[14] Available at
http://www.marcorsyscom.marines.mil/Portals/59/Publications/MCO%201610.7.pdf.

[15] There are a handful of additional consequences discussed in the Newman declaration that BGen Baker has not attempted to claim are sufficient for jurisdiction. *See* Newman Decl. ¶¶ 13, 15, 18. Even if he had, such arguments would fail for many of the reasons discussed above. For instance, even if this matter were referred to the DoD Inspector General, *see id.* ¶ 13, any adverse consequences stemming from that referral would occur only after a lengthy process (with BGen Baker's participation) that culminated in a discretionary decision likely rooted in his actual conduct. *See* DoD Office of Inspector General Administrative Investigations Manual, ¶¶ 2.2.2.1, 2.2.3., 2.4.2, 4.3.1, 4.3.6, 4.3.10, 5.3.6, 6.3.10, 6.6, available at http://www.dodhotline.dodig.mil/ ai/reports/AI_Manual.pdf.   Moreover, any potential action affecting BGen Baker's security clearance, *see* Newman Decl. ¶ 18, would not occur until after the completion of an adjudicative process where decisions would be within the discretion of the relevant decision-makers. *See* DoD Manual 5200.02, ¶ 9.4, available at http://www.esd.whs.mil/Portals/54/Documents/DD/ issuances/dodm/520002_dodm_2017.pdf. Similarly, BGen Baker would not be removed for cause from his current position, *see* Newman Decl. ¶ 15, unless his senior commander or supervisor made a determination that such a step was warranted based on BGen Baker's actions. Finally, the "titling" and DNA extraction that accompany certain military convictions are inapplicable here. *See* Newman Decl. ¶ 18.   "Titling" occurs when a DoD criminal investigative organization places an individual's name in the title block of the criminal investigative report because the individual is under criminal investigation.   *See* DODI 5505.07, ¶4.1, Glossary, available at http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/550507p.pdf.     But there is nothing to suggest that BGen Baker's conduct triggered any such investigation.   And BGen Baker

At bottom, "either the court cannot redress the particular harms [BGen Baker] allege[s] or such harms are too speculative to sustain the exercise of federal jurisdiction." *Gul*, 652 F.3d at 18. Indeed, redressability is absent here because the remedy for BGen Baker's alleged collateral consequences "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562. BGen Baker accordingly has failed to meet his burden of demonstrating that his case is not moot. Moreover, even if the Court were to presume the existence of collateral consequences (and place the mootness burden on Respondents), the fact that all of BGen Baker's would-be consequences share such similar jurisdictional flaws demonstrates that Respondents have overcome any presumption. Either way, Article III jurisdiction is lacking, and the Court should dismiss BGen Baker's petition.

## II.    The Court Should Abstain from Deciding BGen Baker's Petition Because He Has Not Exhausted His Remedies in the Military Commission System.

Even if the Court were to decide that it has jurisdiction over BGen Baker's habeas petition (or choose not to decide that question, *see Al-Nashiri II*, 835 F.3d at 117 n.1), it must abstain from resolving BGen Baker's collateral attack on his contempt finding. BGen Baker has not exhausted his remedies in the military commission system—at a minimum, he must seek mandamus from the U.S. Court of Military Commission Review ("CMCR")—and this Court should not exercise jurisdiction over his habeas petition until he does.

Habeas "is, at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. 298, 319 (1995); *see also Henry v. Henkel*, 235 U.S. 219, 229 (1914) ("[T]he hearing on habeas corpus is not in the nature of a writ of error."). As such, "'prudential concerns,' such as comity and the orderly

---

has not been convicted of a "qualifying military offense" for which DNA extraction is authorized. *See* 10 U.S.C. 1565.

administration of criminal justice, may 'require a federal court to forgo the exercise of its habeas corpus power.'" *Munaf v. Geren*, 553 U.S. 674, 693 (2008) (citations omitted).  In light of those concerns, the Supreme Court established decades ago that a habeas petitioner cannot collaterally attack a military judgment until he has exhausted all available remedies in the military justice system. *Gusik v. Schilder*, 340 U.S. 128, 131–32 (1950).

The Court in *Gusik* considered the habeas petition of a U.S. Army member who had been convicted in a court-martial of murder. *Id.* at 129.  Although the petitioner initially had exhausted "all his remedies for reversal or modification . . . which then existed under the Articles of War," a new remedy—Article 53—became effective in between the District Court's hearing of the petition (which it granted) and the Court of Appeals' review of the case. *Id.* at 129-30.  Article 53 provided "the Judge Advocate General discretion, *inter alia*, to grant a new trial in any court-martial case." *Id.* at 130.  The Court held that, "[i]f Article 53 had been in force when the habeas corpus proceedings were instituted, the District Court would not have been justified in entertaining the petition unless the remedy afforded by the Article had first been exhausted." *Id.* at 131.[16]  *Gusik*, accordingly, established that "habeas corpus petitions from military prisoners should not be entertained by federal civilian courts until *all* available remedies within the military court system have been invoked in vain." *Noyd v. Bond*, 395 U.S. 683, 693 (1969) (emphasis added).

---

[16] Because the District Court had considered the case "before the effective date of Article 53" and before "the question of the exhaustion of the new remedy" had been raised, the Supreme Court chose not to dismiss the petition. *Gusik*, 340 U.S. at 133.  Instead, the Court instructed the Court of Appeals to hold the case in abeyance "pending resort to the new remedy under Article 53." *Id.* No comparable procedural anomaly exists here, given that the remedy BGen Baker must invoke— at a minimum, a mandamus petition to the CMCR—was in place before he filed his habeas petition. *See In re Al -Nashiri*, 791 F.3d 71, 75-78 (D.C. Cir. 2015) ("*Al-Nashiri I*"), *subsequent mandamus proceeding*, 835 F.3d 110 (D.C. Cir. 2016).  Dismissing the petition for failure to exhaust this remedy is therefore the appropriate result in this case.

In establishing this exhaustion requirement, the *Gusik* Court emphasized that federal-court review of military judgments via habeas petition raises similar concerns to reviewing state-court judgments in the same posture.  In the state-court context—as a matter both of precedent and statutory law—"[i]f the state procedure provides a remedy, which though available has not been exhausted, the federal courts will not interfere."  *Gusik*, 340 U.S. at 131.  Such a rule ensures that "[i]f an available procedure has not been employed to rectify the alleged error which the federal court is asked to correct," the federal court can avoid "needless" interference.  *Id.* at 132.  The Court found this policy rationale just "as pertinent to the collateral attack of military judgments as it is to collateral attack of judgments rendered in state courts."  *Id.* at 131-32.

The Supreme Court has extended the holding in *Gusik* to other instances where individuals have sought relief from Article III courts as a means of circumventing the military justice system.  In *Schlesinger v. Councilman,* 420 U.S. 738 (1975), the Supreme Court held that an active-duty military officer could not use a habeas petition to enjoin an ongoing court-martial proceeding arising from his alleged sale and possession of marijuana.  *Id.* at 739-40, 761.  The Supreme Court highlighted two key factors that supported its decision: "strong considerations favoring exhaustion of remedies" and respect for "the integrity of [the] military court process[]."  *Id.* at 761.  Congress, the Court reasoned, adopted "the view that the military court system generally is adequate to and responsibly will perform its assigned task."  *Id.* at 758.  Requiring the petitioner to exhaust his remedial avenues in this "carefully designed" system was therefore appropriate.  *Id.* at 760.

These precedents, which were developed principally in the courts-martial context, apply with equal force to the military commissions established by the MCA.  The D.C. Circuit upheld the "exten[sion] [of] abstention principles" to the military commission context in *Al-Nashiri II*, 835 F.3d at 118.  In affirming the district court's decision to abstain from exercising jurisdiction,

23

the court emphasized that the "review procedure for military commissions" established by Congress was more than sufficient to protect the petitioner's rights. *Id.* at 123; *see also Councilman*, 420 U.S. at 753 ("[D]eference . . . should be accorded the judgments of the carefully designed military justice system established by Congress.").

The exhaustion requirement, and the policy rationale underlying it, apply squarely to BGen Baker's petition. BGen Baker has failed to exhaust "all available remedies within the military court system," *Noyd*, 395 U.S. at 693, because, at a minimum, he has not sought a writ of mandamus from the CMCR. The CMCR is a congressionally-authorized appellate court consisting of civilians and appellate military judges. *See* 10 U.S.C. § 950f. Pursuant to Rule 22(a) of the USCMCR Rules of Practice, "[t]he court may, in its discretion, entertain petitions for extraordinary relief under 28 U.S.C. Section 1651(a) [the All Writs Act], 10 U.S.C. Section 950f, and *In re Al-Nashiri*, 791 F.3d 71, 75-78 (D.C. Cir. 2015) [("*Al-Nashiri I*")]."[17] *Cf. Noyd*, 395 U.S. at 695 n.7 (confirming, in the court-martial context, that a military appellate court may issue emergency writs).

Given that the CMCR has jurisdiction to review a final judgment of "guilty" in the Al-Nashiri case, *see* 10 U.S.C. § 950c(a), it would seem to have jurisdiction to issue a writ of mandamus with respect to BGen Baker's contempt finding under the circumstances present here—namely, where the Chief Defense Counsel of the military commission system was held in contempt for refusing to take actions that would directly shape the defense Al-Nashiri receives for the

---

[17] The 2016 USCMCR Rules of Practice are available at http://www.mc.mil/Portals/0/pdfs/CMCR%20Rules%20of%20Practice%20(Feb%203%202016).pdf.

duration of his military commission case.[18]  In such circumstances, review of that contempt finding would appear to be "in aid of" the CMCR's jurisdiction over the Al-Nashiri case.  28 U.S.C. § 1651(a).  Moreover, given that BGen Baker's challenge to his contempt finding rests on claims about the distinctions between courts-martial and military commissions, the CMCR should have the opportunity to assess his arguments before a habeas court on collateral review does.  BGen Baker has raised "matters as to which the expertise of military courts is singularly relevant, and their judgments indispensable to inform any eventual review in Art. III courts." *Councilman*, 420 U.S. at 760.

Finally, it is immaterial (for purposes of this Court's decision) that BGen Baker's remedy in the military commission system may take the form of mandamus, rather than a direct appeal of his contempt finding.  *See* R.M.C. 809(d) (providing that the Convening Authority's review of a contempt determination "is not subject to further review or appeal").[19]  The Supreme Court has long held that the exhaustion requirement applies even when the available remedy in the military justice system is a petition for an extraordinary writ.  *Noyd*, 395 U.S. at 695 & n.7, 698 (holding that petitioner "fail[ed] to exhaust" the remedy of a habeas petition before the Court of Military Appeals).  And in the state-court context, habeas petitioners often must exhaust state-court mandamus remedies before a federal court will exercise jurisdiction over their petitions.  *U.S. ex rel. Johnson v. McGinnis*, 734 F.2d 1193, 1194 (7th Cir. 1984) (reversing grant of habeas writ because "petitioner should have first sought relief on his due process claim in an Illinois mandamus

---

[18] The D.C. Circuit has jurisdiction over final judgments reviewed by the CMCR.  10 U.S.C. § 950g(a).  Accordingly, it may exercise mandamus jurisdiction over military commission rulings in appropriate circumstances.  *See Al-Nashiri I*, 791 F.3d at 75-78.

[19] The law in the D.C. Circuit suggests that Rule 809(d) would not affect the CMCR's mandamus jurisdiction because "[a] statute"—much less a rule—"does not strip [a court's] authority under the All Writs Act absent a 'clear[]' statement to that effect."  *Al-Nashiri I*, 791 F.3d at 76.

action"); *see also Seaton v. Kentucky*, 92 F. App'x 174, 175 (6th Cir. 2004) (holding when "a mandamus action in state courts . . . may be available, exhaustion is not deemed to be complete").

BGen Baker's lone citation on this point—to *Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004), *see* Suppl. Br. 15-16—stands for the common-sense proposition that exhaustion is not required when an allegedly available remedy is not truly "available" because courts have not provided it. *Lambert*, 387 F.3d at 232 (holding that "state prisoners do not have to invoke extraordinary remedies. . . where the state courts have not provided relief through those remedies in the past" (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999))). But as noted above, the CMCR's Rules of Practice expressly affirm the court's authority to hear petitions for writs of mandamus and cite a less-than-three-year-old D.C. Circuit case in support of that authority. USCMR Rule 22(a) (citing, *inter alia*, *Al-Nashiri I*, 791 F.3d at 75-78). Moreover, the CMCR has never been given the chance to address the procedural and substantive scope of the contempt power in military commissions. BGen Baker, therefore, has not shown that seeking mandamus from the CMCR would "be futile," and he accordingly must exhaust that remedy before this Court may consider his habeas petition. *Gusik*, 340 U.S. at 132.

### III.   The Decision to Hold BGen Baker in Contempt for Repeatedly Failing to Follow a Military Judge's Orders Was Lawful.

In the event this Court decides to exercise jurisdiction over BGen Baker's habeas petition, the Court should uphold Judge Spath's contempt finding as a lawful exercise of his power as a military judge.

### A.  Judge Spath Possessed the Authority to Hold BGen Baker in Contempt.

When Judge Spath held BGen Baker in contempt, he did so pursuant to the MCA and the procedures the Secretary of Defense has established for contempt determinations. In the MCA, Congress authorized military commissions to "punish for contempt any person who uses any

menacing word, sign, or gesture in its presence, or who disturbs its proceedings by any riot or disorder." 10 U.S.C. § 950t(31).  But Congress did not specify how a military commission was to exercise its contempt authority—in fact, "contempt" is not mentioned anywhere else in Chapter 47A.  *See id.* §§ 948a – 950t.

Congress did, however, vest substantial authority in the Secretary of Defense to prescribe "[p]retrial, trial, and post-trial procedures" for military commissions.  10 U.S.C. § 949a(a).  And pursuant to that authority, the Secretary promulgated the Rules for Military Commission ("R.M.C."), which include the contempt procedures at issue here.  R.M.C. 809 makes clear that only the military judge has the power to punish for contempt.  R.M.C. 809(c) ("The military judge shall in *all* cases determine whether to punish for contempt and, if so, what the punishment shall be." (emphasis added)).  In fact, the military judge must conduct any contempt proceedings "outside the [commission] members' presence."  *Id.*  Where, as here, the military judge "directly witnessed" the contumacious actions "in the actual presence of the commission," a summary contempt proceeding is appropriate.  *Id.*; *see also* R.M.C. 103(a)(21) (defining a "[m]ilitary commission" to include, "depending on the context . . . [t]he military judge when a session of a military commission is conducted without members").

BGen Baker never disputes that Judge Spath followed the contempt procedures spelled out in the R.M.C.[20]  *See* Suppl. Br. 23-30.  Given Congress's broad delegation of authority to the Secretary of Defense in promulgating the R.M.C., those procedures must be upheld unless they unambiguously are "contrary to or inconsistent with" Chapter 47A.  10 U.S.C. § 949a(a); *see also*

---

[20] BGen Baker does suggest that additional procedural requirements should have applied to his contempt proceeding.  *See* Suppl. Br. 27-30.  As explained *infra* at 44-45, Judge Spath provided BGen Baker with adequate process, consistent with decades of summary contempt precedent.  To the extent BGen Baker argues that he was entitled to process beyond what the Constitution, the MCA, and the R.M.C require, he provides no authority for that proposition.

*infra* at 35-38 (Secretary of Defense owed deference in interpreting MCA).  BGen Baker cannot

make that unambiguous showing.

### i.   The MCA Does Not Prohibit Military Judges from Making Contempt Findings.

BGen Baker's principal challenge to Judge Spath's authority—and to the authority of any

military judge presiding over a military commission—is his claim that the MCA forbids a military

judge from holding anyone in contempt.  *See* Suppl. Br. 23.  As noted above, the MCA is silent as

to the procedures for contempt determinations, including the issue of whether a military judge may

exercise § 950t(31)'s contempt power.  BGen Baker argues, however, that Congress intentionally

cabined a military judge's authority and that the only way to hold someone in contempt before a

military commission is with a vote of 2/3 of a commission's members.  Suppl. Br. 24 (citing 10

U.S.C. § 949m, which requires "convict[ions] by a military commission under this chapter" to be

"by concurrence of two-thirds of the [primary] members [of the commission] present at the time

the vote is taken").  The text, history, and purpose of the relevant statutory provisions confirm that

this contention is meritless.

Congress first enacted the contempt provision at issue here in the Military Commissions

Act of 2006 ("2006 MCA"), Pub. L. No. 109-366, 120 Stat. 2600.  The 2006 MCA defined

contempt with the same language that is still in effect today, but it codified the contempt provision

in a different section of Chapter 47A—separated from most of the other crimes punishable by

military commissions.  *Compare* 10 U.S.C. § 950w(b) (2006) (original location of contempt

provision), *with* 10 U.S.C. § 950t(31) (current location).  The only other crimes codified alongside

contempt in § 950w under the 2006 MCA relate to perjury and obstruction of justice.   10 U.S.C.

§ 950w(a) (2006); *see also* 10 U.S.C. § 950t(32) (current location of the same "perjury and

obstruction of justice" language from the 2006 MCA).  And the contrast between the language of

the two provisions—"perjury and obstruction of justice," on the one hand, and "contempt" on the other—highlights that Congress never viewed "contempt" as an offense that would be subject to the trial and conviction requirements of the military commission system.

The "perjury and obstruction of justice" provision expressly included (and still includes) a trial provision, providing that "[a] military commission under this chapter may *try* offenses *and* impose such punishment as the military commission may direct for perjury, false testimony, or obstruction of justice related to the military commission."  10 U.S.C. § 950w(a) (2006) (emphasis added).  But the contempt provision was (and remains) limited to the commission's power to punish, providing only that "[a] military commission under this chapter may *punish* for contempt any person who uses any menacing word, sign, or gesture in its presence, or who disturbs its proceedings by any riot or disorder."  *Id.* § 950w(b) (2006) (emphasis added).  Given that, when Congress enacted the 2006 MCA, these were the only two offenses codified in § 950w, Congress's decision to provide a trial for one, but not the other, clearly was intentional.  As such, the voting requirements that are part of the "Trial Procedure" subchapter of Chapter 47A do not apply to contempt determinations.  *See* 10 U.S.C. § 949m (located in Subchapter IV: Trial Procedure).

Looking to the other contempt provisions in effect at the time the MCA contempt provision was enacted confirms that Congress did not withhold contempt power from military judges.  Most significantly, the contempt provision in the Uniform Code of Military Justice defined the offense in almost identical terms.  *Compare* 10 U.S.C. § 848 (2006) ("[A] court-martial, provost court, or military commission may punish for contempt any person who uses any menacing word, sign, or gesture in its presence, or who disturbs its proceedings by any riot or disorder."), *with* 10 U.S.C. § 950w(b) (2006) ("A military commission under this chapter may punish for contempt any person who uses any menacing word, sign, or gesture in its presence, or who disturbs its proceedings by

any riot or disorder.").  Both provisions spoke in terms of the authority to "punish for contempt,"[21] and neither provision mentioned a military judge.  *Id.*  As such, if a military judge had authority to "punish for contempt" under the UCMJ, then a military judge would have been able to do so under the MCA as well.[22]

There is no question that military judges had that authority.  As of 1998 (eight years before the MCA contempt provision was first enacted), the Rules for Courts-Martial ("R.C.M.") provided that "in *all* cases" "the military judge shall . . . determine whether to punish for contempt and, if so, what the punishment shall be."  R.C.M. 809(c) (1998)[23]; *see also* 1998 Amendments to the Manual for Courts-Martial, United States, 63 Fed. R. 30065 (adding that language to the R.C.M. via Executive Order).  Prior to the 1998 amendments, however, the members of a court-martial generally were responsible for making contempt findings.  *See United States v. Burnett*, 27 M.J. 99, 106 (C.M.A 1988) ("[W]hen trials take place before a general or special court-martial with members, the members ultimately decide whether a contempt has been committed."), *entering judgment*, 27 M.J. 425 (C.M.A. 1988).  The Court of Military Appeals had criticized this practice, warning that there is "a danger of prejudice to the accused" if "the alleged contempt is by a defense counsel."  *Id.*  That was so, the court reasoned, because it is "the 'jurors' themselves," *i.e.*, the

---

[21] The contempt provision for Article III courts similarly speaks in terms of a "power to punish" for contempt.  18 U.S.C. § 401.

[22] BGen Baker concedes that looking to the contempt language in the UCMJ is instructive in interpreting the contempt language in the MCA.  *See* Suppl. Br. 23.  But the UCMJ language that BGen Baker cites (from 10 U.S.C. § 848) was enacted in 2011 and therefore was not in effect when either the 2006 MCA or 2009 MCA were enacted.  *See infra* at 32-33, 43-44 (discussing the 2011 legislation).  Accordingly, the 2006 version of 10 U.S.C. § 848 is the correct provision to look to in assessing the meaning of language that was first enacted in the 2006 MCA.  *See Ngiraingas v. Sanchez*, 495 U.S. 182, 187 (1990) (explaining that courts look to "indicia of congressional intent at the time the statute was enacted").

[23] The R.C.M. are located in Part II of the Manual for Courts-Martial.  The 1998 edition is available at https://www.loc.gov/rr/frd/Military_Law/pdf/manual-1998.pdf.

commission members, who had to "determine during the trial whether a contempt has been committed by the attorney and what his punishment should be." *Id.* at 107. In pressing for this "anachronis[tic]" rule to be changed, the court emphasized that "there is no statutory impediment to providing that in *all* cases the military judge will be responsible for conducting contempt proceedings, which will take place outside the presence of the court members." *Id.*

The 1998 amendments to the R.C.M. followed this guidance to a tee. As noted above, R.C.M. 809 was changed to provide that *only* the military judge could punish for contempt, and the new rule also required the military judge to "conduct the contempt proceedings outside the members' presence." R.C.M. 809(c) (1998); *see also* Manual for Courts Martial, Analysis of the Rules for Courts-Martial, app. 21 at A21-48 (2016) (noting that the 1998 amendment to Rule 809 "modernize[d] military contempt procedures" by "vesting contempt power in the military judge and eliminating the members' involvement in the process").[24]

To recap: when Congress enacted the MCA contempt provision in 2006, it did so in language that mirrored the UCMJ—language that, for nearly a decade, had been applied through the Rules for Courts-Martial to *require* that a military judge make all contempt determinations. And when the Secretary of Defense promulgated the inaugural Rules for Military Commissions, he in essence copied and pasted from the contempt procedure from the Rules for Courts-Martial. *Compare* R.M.C. 809(c) (2007), *with* R.C.M. 809(c) (2005).[25] Yet BGen Baker's contention is, in essence, that the Secretary got the contempt procedures 180-degrees backwards by requiring

---

[24] The 2016 edition of the Manual for Courts-Martial is available at: http://jsc.defense.gov/Portals/99/Documents/MCM2016.pdf?ver=2016-12-08-181411-957.

[25] The 2007 edition of the Manual for Military Commissions is available at: https://www.loc.gov/rr/frd/Military_Law/pdf/manual-mil-commissions.pdf. The 2005 edition of the Manual for Courts-Martial is available at: http://www.monterey.army.mil/Legal/criminal_law/mcm.pdf.

military judges to make contempt findings, instead of assigning that responsibility to the commission members.  Moreover, if BGen Baker were correct, then Congress chose to adopt a contempt procedure that it knew would risk substantial prejudice to the accused, *see Burnett* 27 M.J at 106, without explanation of that choice or a justification for why contempt findings in courts-martial should proceed differently.  In short, BGen Baker's reading is implausible.

Subsequent legislation did not alter the meaning of the MCA's contempt provision.  First, when Congress enacted the 2009 MCA, it re-enacted the same contempt language (juxtaposed against the same perjury-and-obstruction-of-justice language) that had been in the 2006 MCA. *Compare* 10 U.S.C. §§ 950t(31), (32), *with* 10 U.S.C. § 950w (2006).  All that changed is the location of the contempt provision in Chapter 47A; it is now under the "Crimes triable by military commission" heading.  10 U.S.C. § 1950t.  But that organizational change—without any change to the provisions themselves—does not (contrary to BGen Baker's suggestion, *see* Suppl. Br. 23) override Congress's choice to authorize punishment for contempt without a trial.  *See, e.g.*, *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 348 (3d Cir. 2003) ("It is a well-settled rule of statutory interpretation that titles and section headings cannot limit the plain meaning of statutory text where that text is clear." (citing *Demore v. Kim,* 538 U.S. 510, 535 (2003) (O'Connor, J., concurring in part and concurring in the judgment)).

Second, the subsequent changes to the UCMJ do not retroactively alter the scope of the MCA.  In 2011, Congress enacted the Ike Skelton National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, 124 Stat. 4137.  Section 542 of that statute provided that "[a] judge detailed to a court-martial . . . a provost court, or a military commission" had the authority to "punish for contempt."  *Id.* § 542(a).  In other words, Congress changed the more permissive, general language that had previously been used in the UCMJ—that a "[a] court-martial, provost

court, or military commission" could "punish for contempt," 10 U.S.C. § 848 (2006)—to a more narrow requirement that a "judge" make the contempt finding, Ike Skelton National Defense Authorization Act § 542(a).  The fact that Congress did not similarly narrow the MCA, *see* Ike Skelton National Defense Authorization Act § 542(c), does not mean that it somehow *prohibited* military judges in military commissions form making contempt findings.  Rather, military judges like Judge Spath retained the power they had always had, under the MCA and R.M.C. 809, to hold a person in contempt.

### ii.  The Procedures in Place for Trying Law-of-War Offenses in Military Commissions Do Not Govern Punishments for Contempt.

BGen Baker highlights various additional procedural requirements, which apply to military commission trials of alien unprivileged enemy belligerents, and argues that those same procedures are required for contempt determinations.  *See* Suppl. Br. 26-28 (citing 10 U.S.C. §§ 948q(a), (b), 948s).  But the same rationale that undercuts BGen Baker's argument about military judges' contempt authority applies to the other claims he makes about contempt procedures under the MCA.

The purpose of the MCA—to "establish[] procedures governing the use of military commissions to try alien unprivileged enemy belligerents for violations of the law of war and other offenses triable by military commission"—highlights that when Congress crafted the procedures for military commissions, those procedures were designed to address detained enemies, not contumacious lawyers.  10 U.S.C. § 948b(a).  Several textual indications confirm that the procedures BGen Baker cites do not apply to contempt determinations.

First, contempt is the only offense defined in the MCA introduced by the phrase "[a] military commission under this chapter may punish . . . ."  10 U.S.C. § 950t(31).  As explained above, that phrasing—especially when contrasted with the phrasing for perjury and obstruction

of justice—confirms that Congress did not intend for military commissions to hold full-fledged contempt trials. *Supra* at 28-29. Moreover, all 30 of the offenses that precede contempt in § 950t include the phrase "*shall* be punished,"[26] whereas the contempt provision is permissive. *Compare* 10 U.S.C. §§ 950t(1)-(30) (emphasis added), *with id.* § 950t(31). That reinforces that Congress viewed contempt differently from the law-of-war offenses codified under the MCA and that contempt determinations are a matter of discretion, rather than a matter that must be tried. As such, the statutory procedures in place "to *try* alien unprivileged enemy belligerents" would not apply to contempt determinations. 10 U.S.C. § 948b(a) (emphasis added).

Second, if Congress intended to apply the MCA's requirements for law-of-war offenses to contempt determinations, that would render another provision of the MCA, § 950p(c), absurd. *See United States House of Representatives v. Burwell*, 185 F. Supp. 3d 165, 183 (D.D.C. 2016) ("When interpreting a statute, 'absurd results are to be avoided.'" (quoting *McNeill v. United States*, 563 U.S. 816, 822 (2011), *holding appeal in abeyance*, 676 F. App'x 1 (D.C. Cir. 2016))). Section 950p(c) provides that "[a]n offense specified in this subchapter"—which includes § 950t—"is triable by military commission under this chapter *only* if the offense is committed in the context of and associated with hostilities." *Id.* § 950p(c) (emphasis added). While that requirement is meaningful in the context of offenses like attacking civilians, *id.* § 950t(2), or spying, *id.* § 950t(27), it is nonsensical in the context of a contempt of court. Again, the better reading of the statute is that Congress viewed contempt as subject to different requirements than offenses that are "*triable* by military commission" under § 950p(c). *Id.* (emphasis added).

---

[26] The definition of the offense of "Destruction of property in violation of the law of war" appears to contain an error, as it is missing the word "be" between "shall" and "punished." 10 U.S.C. § 950t(16).

### iii. The Secretary of Defense is Entitled to Deference in Interpreting any Ambiguous Procedural Requirements in the MCA.

The above analysis makes clear why Respondents have the correct reading of the MCA. But this Court does not need to offer a definitive interpretation of the statute to resolve this case. Rather, the Court need only hold that Respondents' interpretation of the MCA's procedural requirements is permissible. Their interpretation plainly clears that bar.

BGen Baker's challenge to the MCA's procedural requirements is governed by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). *Chevron* applies anytime an agency exercises its delegated authority by promulgating regulations or through other means. *See Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) ("As a general matter, an agency's interpretation of the statute which that agency administers is entitled to *Chevron* deference."). That is particularly true where "Congress has provided 'an express delegation of authority to the agency.'" *Transitional Hosps. Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1025 (D.C. Cir. 2000) (quoting *Chevron,* 467 U.S. at 843-44). At Step One of the *Chevron* analysis, "the court asks if the statute unambiguously forecloses the agency's interpretation . . . ; if it does not, then at Step Two we defer to the administering agency's interpretation as long as it reflects a permissible construction of the statute." *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432 (D.C. Cir. 2012) (citations omitted). Such deference is warranted given the agency's responsibility for assessing competing interests and its familiarity with the "circumstances surrounding the subjects regulated." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (citations omitted).

As an initial matter, this Court must apply the *Chevron* framework because "Congress delegated authority to the [Secretary of Defense] generally to make rules carrying the force of law, and . . . the [Secretary's] interpretation claiming deference was promulgated in the exercise of that

authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  The MCA expressly delegates authority to the Secretary of Defense to prescribe "[p]retrial, trial, and post-trial procedures" for military commissions.  10 U.S.C. § 949a(a).  The Secretary of Defense invoked that authority when he promulgated the R.M.C.  *See* Preamble, Manual for Military Commissions (2016) (citing § 949a(a)).  And the rules prescribed by the Secretary carry the force of law.  *See United States v. Kossman*, 38 M.J. 258, 260 (C.M.A. 1993) (holding that the promulgation of "'[p]retrial, trial, and post-trial procedures' for courts-martial" is an exercise of delegated authority under the UCMJ and that the rules have "the force and effect of law").

In the analogous court-martial context, the Supreme Court repeatedly has given deference to rules the President has promulgated pursuant to his authority under the UCMJ.  In *United States v. Scheffer*, 523 U.S. 303, 312 (1998), the Court upheld the President's decision to promulgate Military Rule of Evidence 707, which excludes polygraph evidence from military trials, as "a rational and proportional means" of furthering legitimate interests.  And in a capital court-martial case, the Court applied administrative-law principles to uphold Congress's delegation of "the authority to prescribe aggravating factors," concluding that the President's promulgation of RCM 1004—the court-martial rule at issue on the subject—"was well within [his] delegated authority." *Loving v. United States*, 517 U.S. 748, 773-74 (1996); *see also* Captain Gregory E. Maggs, *Judicial Review of the Manual for Courts-Martial*, 160 Mil. L. Rev. 96, 109 (1999) (courts should defer to "the President's lawful policy choices" in promulgating the "Military Rules of Evidence and Rules of Courts-Martial Procedure").[27]

---

[27] In *United States v. Bartlett*, 66 M.J. 426, 427-29 (C.A.A.F. 2008), the court declined to apply *Chevron* deference to certain Army regulations, but the regulations at issue in that case "directly conflict[ed]" with the "clear language" of the applicable UCMJ provisions and therefore did not warrant deference.

To be sure, *Chevron* deference is most appropriate for *procedural* rules in the R.M.C., rather than for substantive offenses.  The Court of Appeals for the Armed Forces recently endorsed this distinction in the context of the UCMJ.  It contrasted the President's "power to prescribe regulations for trial *procedures*," on the one hand, with his "interpretation of the elements of substantive offenses," on the other.  *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017) (emphasis added).  The Court held that the President's authority was limited only in the latter context.  *Id.*  Finally, affording *Chevron* deference to procedural rules in the R.M.C. takes account of the "special knowledge about the needs and concerns of the military" that "the President and his advisers" possess, including on "matters of discipline."  Maggs, *supra*, at 110.

Applying the *Chevron* framework here confirms that this Court should not strike down the procedures for contempt determinations in R.M.C. 809.  At Step One, the MCA does not "unambiguously foreclose[]" the Secretary's interpretation of the statute, *Friends of Blackwater*, 691 F.3d at 432, in light of all of the statutory indications that contempt is distinct from the other offenses under the MCA.  *See supra* at 26-34.  And the Secretary's interpretation passes Step Two of the *Chevron* analysis given the extent to which the procedures in Rule 809 mirror the contempt procedures for courts-martial that had been promulgated, pursuant to nearly identical statutory language, when the 2006 MCA and the 2009 MCA were enacted.  *See id.*  At a minimum then, the Secretary's decision to adopt such procedures was "permissible."  *Friends of Blackwater*, 691 F.3d at 432.

### B.  The Military Commission Had Personal Jurisdiction over BGen Baker.

BGen Baker was held in contempt pursuant to a provision that vests military commissions with the power to "punish for contempt *any person* who" engages in contumacious acts before the commission. 10 U.S.C. § 950t(31) (emphasis added).  Despite the clarity of this language, BGen

Baker argues that it is insufficient to confer personal jurisdiction on the military commission. Suppl. Br. 32-33. Instead, he claims that chapter 47A restricts a military commission's jurisdiction exclusively to "alien unprivileged enemy belligerent[s]," and that a commission accordingly can never hold a United States citizen in contempt. *Id.* at 32. This argument is meritless.

BGen Baker relies on two provisions in chapter 47A for his personal jurisdiction claim. First, 10 U.S.C. § 948d provides that "[a] military commission under this chapter shall have jurisdiction to try persons subject to this chapter." Second, a provision entitled "Persons subject to military commissions" provides that "[a]ny alien unprivileged enemy belligerent is subject to trial by military commission as set forth in this chapter." 10 U.S.C. § 948c. Because BGen Baker is not an alien unprivileged enemy belligerent, he contends that he is not subject to the chapter and cannot be punished for any of the offenses in § 950t. For the first 30 of the offenses listed in § 950t, BGen Baker may be correct. Those offenses can be committed by "[a]ny person subject to this chapter." 100 U.S.C. §§ 950t(1)-(30). But the contempt offense is not similarly limited and can be committed by "any person," *id.* § 950t(31)—just like contempt under the UCMJ, 10 U.S.C. § 848(a); *see also United States v. Burnett*, 27 M.J. 99, 104 (C.M.A. 1988) ("Article 48 military jurisdiction is extended to 'any person'—not merely to servicemembers."). This difference in language among the offenses in § 950t demonstrates that Congress clearly intended for military commissions to have broader jurisdiction to make contempt findings than for the preceding 30 offenses in the statute. BGen Baker's reading, however, would render this congressional choice meaningless.

BGen Baker attempts to avoid that absurd outcome by labeling the "any person" language in § 950t(31) a "subject matter jurisdiction" provision—with the "any person subject to this chapter" language in § 948d allegedly providing the statute's only source of personal jurisdiction.

Suppl. Br. 33.  Those labels—which appear nowhere in the statute—do not rescue BGen Baker's reading.  He provides no explanation for why Congress would intentionally expand the military commissions' jurisdiction for punishing contempt while simultaneously prohibiting the commission from exercising *any* of its expanded jurisdiction.  Nor does he provide any explanation for why Congress would have used a personal jurisdiction provision to deny military commissions the power to hold any of the attorneys practicing before the commissions in contempt.  *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not . . . hide elephants in mouseholes.").  After all, no attorney practicing before a military commission would be an alien unprivileged enemy belligerent, which means that if BGen Baker's reading is correct, Congress intended to leave military commissions without jurisdiction to punish *any* commission attorneys for contempt, even if an attorney threatened a military judge or staged an actual riot in the courtroom.  This Court should reject that implausible reading.  *See Burnett*, 27 M.J. at 104 n.8 (rejecting the possibility that courts-martial cannot hold civilian witnesses or counsel in contempt because otherwise they "would lack the power to function effectively").

### C. BGen Baker's Refusal to Follow Orders Disturbed the Commission's Proceedings and Constituted a "Disorder."

The MCA permits a military commission to "punish for contempt any person who . . . disturbs its proceedings by any riot or disorder."  10 U.S.C. § 950t(31).  That is precisely what BGen Baker did.  By repeatedly refusing to comply with Judge Spath's orders to take the witness stand and to rescind his purported excusal of Al-Nashiri's three civilian attorneys,[28] BGen Baker

---

[28] BGen Baker suggests that these orders were not correct as a matter as a law, *see* Suppl. Br. 29, but that has no bearing on whether he was obligated to follow them.  *See, e.g.*, *Walker v. City of Birmingham*, 388 U.S. 307, 320 (1967) (parties may not "by-pass orderly judicial review" of a court order "before disobeying it").  In any event, both orders were not without basis.  Judge Spath determined that BGen Baker lacked the power to unilaterally excuse three civilian defense

not only disturbed the October 31, 2017 military commission proceedings, he created a disorder with lasting effects on the commission's trial of Al-Nashiri. *See* Tr. at 10063 (explaining that Gen. had "caused a significant disorder to the process"). In the wake of BGen Baker's refusal to rescind his order excusing the civilian attorneys, including Al-Nashiri's learned counsel, all of the witnesses for the commission's November hearing had to be rescheduled. Wells Decl. ¶ 44. The consequences of BGen Baker's contumacious conduct are therefore more disruptive to the commission than a "riot" or other courtroom incident that might "disturb[]" the commission's proceedings only temporarily. *See* 10 U.S.C. § 950t(31). In Judge Spath's words, the result has been "disorder and havoc." Wells Decl. ¶ 44.

Judge Spath was not powerless to address such fundamental disruptions. The Supreme Court has long recognized that "[t]he power to punish for contempts is inherent in all courts" and that the contempt power "is essential . . . to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." *Ex parte Robinson*, 86 U.S. 505, 510 (1873). Given that Judge Spath expressly invoked the MCA's statutory authority here, there is no need to decide whether military commissions possess inherent contempt power. *See Burnett*, 27 M.J. at 104 (questioning whether such inherent power exists). But the long-recognized necessity of the contempt power should still shape any interpretation of statutory contempt power

---

attorneys in light of substantial authority for the proposition that, after an attorney has made his appearance, a trial judge has the power to determine whether there is good cause for him to withdraw. *See* Wells Decl. ¶ 37; *see also id.* (citing the ruling of a different military commission judge who similarly determined that the R.M.C. do not give the chief defense counsel authority to unilaterally excuse a defense attorney at even late stages of a military commission trial). Moreover, Judge Spath's order to have BGen Baker testify about the disruption BGen Baker's caused the commission was plainly within his authority to preside over the commission's proceedings and call witnesses. *See* R.M.C. 801(a); Military Commission Rule of Evidence 614(a). BGen Baker's citation to R.M.C. 703(e)(1), which pertains to the *attendance* of a witness, but not a witness's decision to testify once in court, is inapposite. *See* Suppl. Br. 29.

under the MCA, given that Congress is unlikely to have deprived, without comment, military commissions of a tool "essential" to the administration of justice.

Turning to the relevant statutory provisions, neither the MCA nor the UCMJ defined "disorder" when § 950t(31) was enacted.  Military courts, however, had interpreted the UCMJ contempt provision to encompass conduct like BGen Baker's.  In *United States v. Cole*, 31 C.M.R. 16, 20 (1961), the Court of Military Appeals criticized a court-martial law officer for failing to employ the contempt power "conferred upon [him] by Congress" when a witness repeatedly refused to answer reasonable questions.  The contempt power, the court reasoned, exists to ensure that trials may "proceed in a fair and orderly manner."  *Id.*; *see also United States v. Ferdinand*, 29 M.J. 164, 167 (C.M.A. 1989) (suggesting a military judge could have resorted to "his contempt powers under Article 48" when faced with the prospect that a parent would refuse to produce her child as a witness, even if the judge had ordered it).  BGen Baker's repeated non-compliance with the military judge's orders similarly impaired the ability of the Al-Nashiri case to proceed in an orderly fashion and, therefore, constituted a "disorder" within the meaning of the statute.

In *Burnett*, the Court of Military Appeals conducted an in-depth review of contempt authority and concluded that the UCMJ's contempt provision was not so broad as to encompass "*any* disorder or disrespect to the court."  27 M.J. at 106 (alterations omitted) (emphasis added). But while the court rejected that overly broad reading of contempt, it also rejected the narrow reading that BGen Baker advances here.  *Id.* at 104-06.  The court considered the same treatise on which BGen Baker principally relies—Col. Winthrop's *Military Law and Precedents*—which lists assaults, altercations, and "noise or confusion which prevents the court from hearing . . . testimony" as some of the examples of a "disorder."  *Id.* at 105 (quoting W. Winthrop, *Military Law and Precedents* 307 (2d ed. 1920 Reprint)); *see also* Suppl. Br. 21-22.  The court determined,

41

however, that in the years since Winthrop's treatise, the Court of Military Appeals likely had "interpreted the language of Article 48 in a more sweeping way than Winthrop had in mind," including in *Cole*. *Burnett*, 27 M.J. at 105. The *Burnett* court was emphatic that it did "not retreat from these interpretations." *Id.* In other words, the court did not "endorse[] Winthrop's narrow construction of the contempt provision," Suppl. Br. 21; it endorsed the "more sweeping" interpretations of the provision from cases like *Cole*. And although the attorney conduct the court considered in *Burnett* ultimately did not rise to the level of contempt, there was no indication that the attorney had meaningfully disrupted the court-martial proceedings. *See* 27 M.J. at 102-03 (quoting allegation that the attorney had been "insolent in [his] comments" and when questioning a witness); *see also United States v. Clark*, 4 F. Supp. 2d 940, 944 (C.D. Cal. 1998) (recognizing, in the wake of *Burnett*, that "practicing law without a license in a military court could be considered a disorder which disturbs judicial proceedings," even though such a result might not be a "traditional application of Article 48"). The disruptive conduct at issue here, which meaningfully interfered with the proceedings in the Al-Nashiri case, is more significant than the conduct at issue in *Burnett* and, therefore, qualifies as a "disorder."

BGen Baker's interpretation of "disorder," by contrast, would prohibit a commission from holding in contempt an attorney who disregards orders central to the functioning of a commission proceeding. His principal reason for contending that Congress imposed such a restriction stems from legislation that Congress enacted *after* the 2009 MCA. Specifically, in 2011 Congress changed the UCMJ's contempt provision to include "willfully disobey[ing] the lawful writ, process, order, rule, decree, or command of the court-martial, court, or military commission." Ike Skelton National Defense Authorization Act § 542 (codified at 10 U.S.C. § 848). From this change to the UCMJ, BGen Baker infers that Congress could not have intended the MCA's contempt

provision to cover willful disobedience, regardless of how disruptive to the commission's functioning.  Suppl. Br. 18-19.

The better explanation for the change, however, stems from the guidance that had been issued in the Rules for Courts-Martial, but which had *not* been issued in the Rules for Military Commissions.  Specifically, the non-binding discussion accompanying Rule 809 in the courts-martial context provided that:

> The military judge may issue orders when appropriate to ensure the orderly progress of the trial.  Violation of such orders is *not punishable under Article 48*, but may be prosecuted as a violation of Article 90 or 92. *See also* Article 98.

> Refusal to appear or to testify is *not punishable under Article 48*. Persons not subject to military law having been duly subpoenaed, may be prosecuted in Federal civilian court under Article 47 for neglect or refusal to appear or refusal to qualify as a witness or to testify or to produce evidence. Persons subject to the code may be punished under Article 134 for such offenses.

Discussion, R.C.M. 809(a) (2008) (emphasis added).  In other words, the R.C.M. had instructed military judges not to use their contempt power to punish failures to comply with the court-martial's orders, but rather to use the other powers made available by the UCMJ to prosecute non-compliance.  No similar restrictions on the contempt power existed (or now exist) in the R.M.C., and the MCA does not provide the kinds of alternative means for ensuring compliance found in the UCMJ.  Accordingly, if Congress wanted to ensure that military judges in both courts-martial and military commissions could punish attorneys for disobeying court orders that disrupted the orderly progress of a trial, it needed to change only the text of the UCMJ.  That is what it did.

BGen Baker, however, suggests that Congress must have intended to *deny* military commission judges the power to punish an attorney's disruptive disobedience of a court order with contempt because of 10 U.S.C. § 848(c).  *See* Suppl. Br. 18-19.  That subsection clarifies that "[t]his section," meaning the UCMJ's contempt provision, "does not apply to a military

commission established under chapter 47A of this title." 10 U.S.C. § 848(c).  BGen Baker argues

that because that language was included in the 2011 Ike Skelton National Defense Authorization

Act, Congress must not have wanted military commissions to have the same kind of contempt

power as courts-martial.  *See* Suppl. Br. 18-19.  But the language in § 848(c) is actually from the

2006 MCA.  *See* 2006 MCA § 4(a)(2).  In other words, from the moment Congress first enacted

the MCA, it has recognized that the contempt provision in the UCMJ and the contempt provision

in the MCA are statutorily distinct.  And when Congress passed the 2011 Ike Skelton National

Defense Authorization Act, it simply left the language that established this distinction intact.  For

the reasons outlined above, the MCA has always authorized military commissions to punish for

contempt conduct like the disruptive disobedience at issue here.  The language in what is now

§ 848(c) does not alter that authority.

### D.  BGen Baker Received Adequate Process.

The summary contempt proceeding that Judge Spath conducted also complied with

longstanding due-process precedents.  In *Sacher v. United States*, 343 U.S. 1, 9-10 (1952), the

Supreme Court held that when events triggering a contempt finding "occur[] in [the judge's]

presence," a court may "dispense[] with the formality, delay and digression that would result" from

more involved process and may hold a summary proceeding instead.  A summary contempt

proceeding does not require "the issuance of process, service of complaint and answer, holding

hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all

that goes with a conventional court trial" because "[t]he purpose of [those] procedure[s] is to

inform the court of events not within its own knowledge"—a consideration that is inapplicable

when the court witnesses contumacious conduct firsthand.  *Id.* at 9; *see also Taylor v. Hayes*, 418

U.S. 488, 497 (1974) (affirming a "trial judge's power, for the purpose of maintaining order in the

courtroom, to punish summarily and without notice or hearing contemptuous conduct committed in his presence and observed by him").

Moreover, the summary contempt power does not need be "immediate[ly] exercise[d]" to be lawful. *Sacher*, 343 U.S. at 10. To be sure, when a contempt proceeding is substantially delayed—for instance, when it takes place after the trial in which the contempt occurred—thornier due process questions arise. *See Taylor*, 418 U.S. at 497. But BGen Baker cites no case where a delay of one day has been held to render a summary contempt proceeding unconstitutional. The fact that Judge Spath took a day before announcing a punishment and reciting the facts for the record (as required by R.M..C. 809(c)) does not alter the due process calculus, given that he directly witnessed the conduct that formed the basis of his contempt determination.

In any event, even though the summary contempt proceeding met the demands of due process, this Court does need to reach that issue. After all, BGen Baker had the opportunity to (and did) raise his "multiple potential defenses to a contempt finding" before the Convening Authority. *See* Suppl. Br. 30; *see also* Suppl. Br., Ex. K (BGen Baker's filing before the Convening Authority). In fact, all five of the principal arguments he makes in his brief in this case were presented to the Convening Authority. *Compare* Suppl. Br., *with* Suppl. Br., Ex. K. Yet after BGen Baker received that process—the sufficiency of which he never disputes—the Convening Authority upheld Judge Spath's contempt finding "in law and fact." CA Mem. at 1. At best then, BGen Baker has raised the issue of *when*, not *if*, he received due process. Resolving that issue does not bear on whether to vacate the contempt finding.

## CONCLUSION

For these reasons, Respondents respectfully request that the Court dismiss the petition for writ of habeas corpus or, in the alternative, that it deny the writ.

Dated: January 12, 2017                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           JENNIFER D. RICKETTS
                                           Director

                                           TERRY M. HENRY
                                           Assistant Branch Director

                                           */s/ Michael H. Baer*                   
                                           MICHAEL H. BAER
                                           Trial Attorney (New York Bar No. 5384300)
                                           U.S. Department of Justice,
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Avenue, NW
                                           Washington, DC 20530
                                           Telephone:    (202) 305-8573
                                           Facsimile:    (202) 616-8460
                                           E-mail: Michael.H.Baer@usdoj.gov

                                           *Counsel for Respondents*