# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BRIGADIER GENERAL JOHN G. BAKER,** | § | |
| **U.S. MARINE CORPS,** | § | |
| | § | |
| **PETITIONER,** | § | |
| | § | **No. 17-cv-02311-RCL** |
| v. | § | |
| | § | |
| **COLONEL VANCE SPATH, U.S. AIR FORCE,** | § | |
| **in his official capacity;** | § | |
| | § | |
| **JAMES MATTIS, SECRETARY OF DEFENSE,** | § | |
| **in his official capacity,** | § | |
| | § | |
| **RESPONDENTS.** | § | |

## Memorandum Opinion

The Court has before it Brigadier General John G. Baker's Petition for Writ of Habeas

Corpus (the "Petition"). (ECF No. 1). Upon consideration, the Court concludes the following:

1. That the presumption of collateral consequences applies to the contempt finding against General Baker. Therefore, the Petition is not moot and the Court has jurisdiction over this case;

2. That General Baker has exhausted all available remedial paths within the Military Commission system. Therefore, the Court will not abstain from exercising jurisdiction over this case under the doctrine set forth in *Schlessinger v. Councilman*;

3. That the Military Commission does have personal jurisdiction over General Baker for the purposes of making findings of and punishments for contempt; and

4. That Judge Spath (and military judges in Chapter 47A military commissions generally) does not possess a unilateral contempt power.

For these reasons, the Court **GRANTS** General Baker's Petition and will issue the writ he requests.

## Background

The petitioner, Brigadier General John G. Baker ("General Baker"), is the Chief Defense Counsel of the Military Commission System. The first respondent, Colonel Vance Spath ("Judge Spath"), is a military judge presiding over the Military Commission that is trying the capital case of Abd Al-Rahim Hussein Al-Nashiri ("Al-Nashiri") at Naval Station Guantanamo Bay, Cuba. The second respondent, Secretary James Mattis, is the Secretary of Defense and is the official promulgator of the Rules for Military Commissions ("R.M.C.") as authorized by the Military Commissions Act of 2009 ("MCA"). Under the authority of those rules, Judge Spath issued the findings and sentence that are the subject of this case.

On October 11, 2017, General Baker excused all but one of Al-Nashiri's defense counsel because the excused counsel had ethical concerns regarding their continued representation of Al-Nashiri. The excused counsel consisted of Al-Nashiri's learned capital counsel and two other civilian defense attorneys employed by the Department of Defense. The lone remaining defense attorney, Lieutenant Alaric Piette, does not qualify as learned counsel in capital cases and is not qualified to serve as the sole counsel in capital cases under the Military Commissions Act of 2009. Because of this, Al-Nashiri requested an abatement of his case, which Judge Spath denied on October 27.

Judge Spath convened a hearing in Al-Nashiri's Military Commission on October 31. At that hearing, Judge Spath ordered General Baker to take the witness stand and testify. General Baker, claiming privilege, refused the order. Judge Spath also ordered General Baker to rescind his excusal of Al-Nashiri's learned counsel and two civilian defense attorneys. General Baker refused that order as well.

The next day, Judge Spath held a summary contempt proceeding against General Baker. At that proceeding, Judge Spath expressly denied General Baker the opportunity to be heard, citing the summary nature of the proceeding. Judge Spath then held General Baker in contempt for his refusal to obey the order to testify and the order to rescind his excusal of Al-Nashiri's learned counsel. After holding General Baker in contempt, Judge Spath sentenced General Baker to 21 days' confinement and a $1,000 fine.

General Baker was confined in a trailer in a housing area at Naval Station Guantanamo Bay beginning on November 1, 2017. The next day, while General Baker was still confined, his counsel filed a petition for a writ of habeas corpus with this Court. (ECF No. 1). A hearing was held that afternoon. After hearing argument from counsel for both sides, the Court stated that it would announce its ruling at a subsequent hearing to be held at 2:00 p.m. on Friday, November 3, 2017.

But the Court did not announce its ruling at that hearing. About one hour before that hearing began, the convening authority deferred General Baker's confinement for the duration of its review of the contempt finding and sentence. In light of that development, the Court saw no more urgency to the situation and decided to defer ruling on the Petition (without actually staying the case) until the convening authority could complete its review and the parties could submit additional briefing.

The convening authority completed its review on November 21, 2017. The convening authority decided to leave Judge Spath's contempt finding intact, but remitted the remainder of General Baker's sentence (both the confinement term and the fine). The convening authority also forwarded the record of the contempt proceedings and findings "to the appropriate authority overseeing [General Baker's] service as a Judge Advocate within the Department of the Navy, the

DoD Standards of Conduct Office, and the Staff Judge Advocate to the DoD General Counsel's Office, and the Commandant of the United States Marine Corps for an administrative ethics review." Action on Contempt Proceedings at 1. On November 22, General Baker's counsel asked whether the convening authority intended to refer his case to the Court of Military Commission Review ("CMCR"). Such a referral has not occurred to date.

Having carefully considered all of the briefs, evidence, and law before it, the Court is now prepared to announce its ruling and the reasoning behind that ruling.

## Summary of Arguments

General Baker makes five arguments in support of his contention that the contempt finding was unlawful:

1. That his actions at the October 27, 2017, hearing do not meet the statutory definition of contempt set forth in 10 U.S.C § 950t(31);

2. That Judge Spath, as a military judge, had no authority to unilaterally impose a contempt finding;

3. That the summary contempt procedures employed by Judge Spath violated the MCA;

4. That the summary contempt procedures employed by Judge Spath violated General Baker's due process rights; and

5. That the military commission had no personal jurisdiction over General Baker.

The respondents oppose all of General Baker's arguments. In addition, they assert two affirmative grounds on which they believe the Court should dismiss the Petition:

1. The Petition is moot because General Baker is no longer confined and will allegedly suffer no collateral consequences as a result of the contempt finding; and

2. The Court should abstain from considering the Petition under the doctrine of *Schlessinger v. Councilman* because General Baker allegedly has not exhausted all available avenues of relief internal to the military commission system.

Both of the respondents' affirmative arguments raise threshold issues pertaining to this Court's jurisdiction over this case. Therefore, the Court will address them first. The Court will then address the question of whether the Military Commission has jurisdiction over General Baker to find him in contempt. Lastly, the Court will address the question of whether Judge Spath had power to unilaterally hold General Baker in contempt. Because the Petition may be granted on the basis of these issues alone, the Court will not address the remainder of the issues raised by General Baker.

**Analysis**

**I.     This Court May Properly Consider General Baker's Habeas Petition.**

The first issue before the Court is whether it may properly consider the Petition. The respondents argue that it may not for two reasons. First, they argue that the Court lacks subject matter jurisdiction over the Petition because it is moot. Second, they argue that General Baker has failed to exhaust all of his other available remedies, so the Court should abstain from considering the Petition even if it is not moot. The Court disagrees with the respondents on both points and finds that it may properly consider the Petition.

> *A.  The Petition Is Not Moot. Therefore, the Court Has Subject Matter Jurisdiction Over It.*

The Constitution confines the judicial power to actual cases or controversies. *See* U.S. Const. art. III § 2. Therefore, when a lawsuit no longer presents a live controversy—in other words, when a lawsuit becomes moot—a court loses the power to adjudicate that lawsuit. *See Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) ("Even where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."). For that reason,

5

mootness is a "threshold jurisdictional issue" that the Court must address before turning its attention to the merits of this case. *Coal. of Airline Pilots Ass'ns v. FAA*, 370 F.3d 1184, 1189 (D.C. Cir. 2004).

The respondents argue that this lawsuit is moot because General Baker has already received all of the relief sought in the Petition. In his original "Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241," General Baker wrote the following as his request for relief: "order the petitioner's immediate release." (ECF No. 1-1 at 7). And the petitioner has been released.

But the mere fact that General Baker has received all the relief he asked for in his original Petition does not by itself render this case moot. It is a well-established principle, one that all parties in this case acknowledge, that "an attack on a criminal conviction [is] not rendered moot by the fact that the underlying sentence has expired" or otherwise will not be served (as, here, through deferral of the remainder of General Baker's sentence). *Lane v. Williams*, 455 U.S. 624, 632 (1982). The Supreme Court has "held unanimously that the writ of habeas corpus [is] available . . . where the petitioner had been in custody when he applied for the writ, but had been released before this Court could adjudicate his claims." *Sibron v. New York*, 392 U.S. 40, 51 (1968) (citing *Carafas v. La Vallee*, 391 U.S. 234 (1968)); *see also St. Pierre v. United States*, 319 U.S. 41, 43 (1943) (permitting adjudication of the merits of a criminal case where "under either state or federal law further penalties or disabilities can be imposed . . . as a result of the judgment which has . . . been satisfied").

But this principle is not universal. "[A] criminal case is moot *only* if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Lane*, 455 U.S. at 632 (quoting *Sibron*, 392 U.S. at 57) (emphasis added).

The question before the Court, then, is whether there is a possibility that General Baker may suffer from collateral legal consequences as a result of his conviction for contempt.

General Baker bears the burden of showing that this case is not moot. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (stating that "[t]he party invoking federal jurisdiction bears the burden of establishing" that the elements of the Art. III case-or-controversy requirement are met). As such, he "bears the burden of establishing" that there is a possibility that "collateral consequences" will be imposed as a result of the contempt finding. *In re Petitioners Seeking Habeas Corpus Relief in Relation to Prior Detentions at Guantanamo Bay*, 700 F. Supp. 2d 119, 129 (D.D.C. 2010), *aff'd sub nom. Chaman v. Obama*, No. 10-5130, 2012 WL 3797596 (D.C. Cir. Aug. 10, 2012).

### 1) The Presumption of Collateral Consequences Applies to this Case.

General Baker attempts to meet his burden in two ways: (1) by showing that there is a presumption of collateral legal consequences in his case, and (2) by enumerating specific collateral consequences that he believes could result from Judge Spath's contempt finding.

In habeas challenges to state- and federal-court convictions, the Supreme Court has "been willing to presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur)." *Spencer v. Kemna*, 523 U.S. 1, 8 (1998). The respondents argue that the Court ought not to extend this presumption to the context of convictions arising out of military commissions. In considering this argument, the Court thinks it wise to review the history of this presumption. The Supreme Court summarized the initial development of the doctrine in its opinion in *Sibron*:

> *St. Pierre* implied that the burden was upon the convict to show the existence of collateral consequences. Three years later in

*Fiswick v. United States*, 329 U.S. 211 (1946), however, the Court held that a criminal case had not become moot upon release of a prisoner, noting that the convict, an alien, might be subject to deportation for having committed a crime of "moral turpitude"— even though it had never been held (and the Court refused to hold) that the crime of which he was convicted fell into this category. The Court also pointed to the fact that if the petitioner should in the future decide he wanted to become an American citizen, he might have difficulty proving that he was of "good moral character."

The next case which dealt with the problem of collateral consequences was *United States v. Morgan*, 346 U.S. 502 (1954). There the convict had probably been subjected to a higher sentence as a recidivist by a state court on account of the old federal conviction which he sought to attack. But as the dissent pointed out, there was no indication that the recidivist increment would be removed from his state sentence upon invalidation of the federal conviction, and the Court chose to rest its holding that the case was not moot upon a broader view of the matter. Without canvassing the possible disabilities which might be imposed upon Morgan or alluding specifically to the recidivist sentence, the Court stated: "Although the term has been served, the results of the conviction may persist. Subsequent convictions may carry heavier penalties, civil rights may be affected. As the power to remedy an invalid sentence exists, we think, respondent is entitled to an opportunity to attempt to show that his conviction was invalid."

Three years later, in *Pollard v. United States*, 352 U.S. 354 (1957), *the Court abandoned all inquiry into the actual existence of specific collateral consequences* and in effect presumed they existed. With nothing more than citations to *Morgan* and *Fiswick*, and a statement that "convictions may entail collateral legal disadvantages in the future," the Court concluded that "the possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits." The court thus acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences. The mere "possibility" that this will be the case is enough to preserve a criminal case from ending "ignominiously in the limbo of mootness."

*Sibron*, 392 U.S. at 54–55 (emphasis added).

Since reaching its high point in *Sibron*, this doctrine has been narrowed and confined by the Supreme Court and other courts. In *Lane v. Williams*, the Supreme Court refused to extend the presumption to persons who elected to attack only a portion of their sentences (parole terms of

which they allegedly were not informed), rather than their underlying convictions. 455 U.S. at 632. In doing so, the Court reasoned that "[n]o civil disabilities such as those present in *Carafas* result from a finding that an individual has violated parole." *Id.* In *Spencer v. Kemna*, the Supreme Court declined "to presume that collateral consequences adequate to meet Article III's injury-in-fact requirement" would result from a parole revocation order. 523 U.S. at 14. The Supreme Court also generally "cautioned against extension of the presumption of collateral consequences." *Gul v. Obama*, 652 F.3d 12, 16 (D.C. Cir. 2011) (citing *Spencer*, 523 U.S. 1).

In *Gul v. Obama*, the D.C. Circuit declined to apply the presumption of collateral consequences to petitioners who had previously been detained at Guantanamo Bay pursuant to determinations that they were enemy combatants. 652 F.3d at 17. In doing so, the D.C. Circuit cited "three prudential reasons for its conclusion" that it drew from *Spencer*:

> First, presuming or accepting the remote possibility of collateral consequences . . . sits uncomfortably beside the long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record. Second, the presumption of collateral consequences had been developed during an era in which it was thought that the only function of the constitutional requirement of standing was to assure that concrete adverseness which sharpens the presentation of issues, a view which has since yielded to the acknowledgement that the constitutional requirement is a means of defining the role assigned to the judiciary in a tripartite allocation of power. And third, it was not clear a presumption of significant collateral consequences from revocation of parole would comport with reality.

*Id.* (internal quotations and citations omitted). Relying on these reasons, the respondents urge the Court not to extend the presumption of collateral consequences to a conviction arising out of a military commission. *Id.*

Having considered all of these arguments and the precedent cited by the parties, the Court concludes that the presumption of collateral consequences applies to General Baker's

contempt conviction. *Lane*, *Spencer*, and *Gul* are all inapposite. The primary reason they are inapposite is because none of those cases involved an attack on an underlying criminal conviction. *Lane* and *Spencer* both involved attacks on parole determinations and *Gul* involved an attack on a non-criminal designation as an enemy combatant.

This distinction was a critical feature of the Supreme Court's opinion in *Lane*. The Supreme Court observed that the respondents[1] in that case could have sought to remedy the alleged failure to warn them of the parole portions of their sentences in two ways. *Lane*, 455 U.S. at 630. First, they could have asked "the District Court to set aside their convictions and give them an opportunity to plead anew." *Id.* Second, they could have sought "relief in the nature of 'specific enforcement,'" i.e., "the elimination of the mandatory parole term from their sentences." *Id.* Had they chosen the first option, the Supreme Court explicitly said their case would not have been moot. *Id.* But the respondents chose the second option and attacked only their sentences. *Id.* at 631. "Since [they] elected only to attack their sentences, and since those sentences expired during the course of these proceedings," the case was moot. *Id.*

General Baker's case is entirely different. He attacks not his sentence (which has been deferred), but his underlying contempt conviction. This fact alone removes General Baker's case from the ambit of *Lane* and *Spencer*.

*Gul* also poses no obstacle to this Court's consideration of General Baker's Petition. The petitioners in *Gul* challenged their designations as "enemy combatants." 652 F.3d at 13, 15–17. The D.C. Circuit refused to apply the presumption of collateral consequences to this designation, stating that "detention at Guantanamo and designation as an enemy combatant are recent phenomena; we have no basis for inferring they routinely have collateral consequences."

---

[1] Respondents at the appellate level. They were the petitioners at the trial level.

*Id.* at 17. It also found that any harms that may theoretically flow from the designation were "beyond the power of the Court to redress." *Id.* at 18.

But General Baker's case again is different. *Gul* was an unusual case involving persons "seized on a battlefield and [then] in the custody of a foreign sovereign" who had since been returned to the control of foreign sovereigns. *Id.* at 17. This meant the case "infringe[d] upon the domain of the branches of government responsible for the external relations of the Nation." *Id.* No matter how interesting the particular circumstances may be, General Baker's case is different in how normal it is. General Baker is a United States citizen who has been found guilty of criminal contempt. "Criminal contempt is a crime in the ordinary sense." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968). It is "indistinguishable from ordinary criminal convictions." *Id.* Criminal contempt convictions are not recent phenomena. And a conviction for criminal contempt's "impact on the individual defendant is the same" as the impact of any other criminal conviction. *Id.* There are no international relations concerns to consider at all.

General Baker, through habeas, attacks his underlying criminal conviction. He does not attack merely his sentence. And this case involves no international relations concerns. Therefore, the Court finds that the presumption of collateral consequences applies to this case.

2) *The Respondents Have Not Presented Evidence or Argument Sufficient to Overcome the Presumption of Collateral Consequences.*

The respondents have not presented evidence or argument to the Court that can overcome the presumption of collateral consequences in this case. What the respondents have done is rebutted—or attempted to rebut; the Court takes no position on the adequacy of the respondents' rebuttals—General Baker's proposed examples of the collateral consequences that he faces. But such rebuttals of specific collateral consequences identified by the petitioner in a habeas case are insufficient to overcome the presumption.

First, a finding that such rebuttals are sufficient would introduce perverse incentives to the pleading and briefing strategy of habeas petitioners. A petitioner asserting the presumption of collateral consequences would have two equally unacceptable options: (1) He could not provide examples of any specific collateral consequences he faces. This would perhaps force the respondent to rebut the presumption through more difficult methods than mere rebuttals. But it would also put the petitioner at risk if the court finds that the presumption should not apply—he would have no backup collateral consequences to which he could point. (2) He could provide concrete examples of collateral consequences he faces. This would protect him against a finding that the presumption does not apply. But it would also make the presumption unacceptably easy to overcome through merely rebutting a few concrete examples. Both options are unfair to petitioners.

That being the case, what type of evidence or argument would be sufficient to overcome the presumption? *Lane* provides some guidance. In footnote 12 of the majority opinion, the Court notes that the State of Illinois, by law, chose "to define narrowly the collateral civil penalties that attach even to a conviction of a criminal offense; generally, collateral consequences do not extend beyond the completion of the sentence or the release from imprisonment." 455 U.S. at 632 n.12. If respondents can point to law within the relevant jurisdictions that necessarily limits or eliminates collateral consequences of the conviction in question, that could possibly overcome the presumption. The work of scholars and other surveyors of the law may be helpful in such an endeavor. Just because courts have "consistently refused to canvass state law to ascertain 'the actual existence of specific collateral consequences'" does not, in this Court's view, mean that the parties cannot do so for them. *Lane*, 455 U.S. at 634–35 (Marshall, J., dissenting) (quoting *Sibron*, 392 U.S. at 55).

But this is beside the point. The point is that the respondents have not provided to the Court either the type or quantum of information needed to overcome the presumption of collateral consequences as it applies to this case. Therefore, the Court presumes that General Baker will suffer collateral consequences as a result of his criminal contempt conviction and this case is not moot. Having determined this, the Court need not examine the specific examples of collateral consequences that General Baker claims will attach to him as a result of his conviction.

### B. General Baker Has Exhausted All Necessary Alternative Avenues of Relief, so the Court Will Not Abstain from Considering the Petition.

The respondents argue that even if this case is not moot (which it is not), the Court should abstain from considering the Petition because General Baker has not exhausted all possible avenues for relief within the military commission system itself. *See generally Schlesinger v. Concilman*, 420 U.S. 738 (1975) (finding that district courts should abstain, as a matter of comity, from habeas or other collateral review of decisions by the military court system where review within the military court system itself would be sufficient to grant the relief the petitioner requests). Specifically, the respondents argue that General Baker should first seek mandamus relief from the Court of Military Commissions Review (CMCR) before being allowed to seek habeas relief from this Court.

The Court does not think that General Baker must first seek mandamus relief from the CMCR before this Court should entertain his Petition.

First, the Court finds the respondents' argument rather disingenuous. Rule 809 of The Rules for Military Commissions (insofar as it is valid) governs contempt proceedings in military commissions. Rule 809(d) governs the review of contempt proceedings. It provides the following process for review of contempt proceedings:

13

> [A] separate record of the contempt proceedings shall be prepared
> and forwarded to the convening authority for review. The
> convening authority may approve or disapprove all or part of the
> sentence. The action of the convening authority is not subject to
> further review or appeal.

R.M.C. 809(d). General Baker's conviction went through these procedures. A record was forwarded to the convening authority for review. The convening authority upheld the contempt finding,[2] but suspended the remainder of General Baker's sentence. And according to the rule, that "action of the convening authority is not subject to further review or appeal." *Id.* Despite that clear language within the rules governing the military commission system, the respondents assert that the convening authority's decision actually is subject to further review within the military commission system in the form of mandamus to the CMCR.

But that position is clearly contrary to R.M.C. 809(d). That might not have been so had the rule read only that the decision of the convening authority is not subject to further "appeal." That would leave open the possibility of further "review" within the military commission system. But the rule says that the decision of the convening authority is not subject to further "review or appeal." *Id.* The point is clear—the decision of the convening authority after reviewing a finding of contempt is to be final within the commission system. That being the case, the Court does not agree that General Baker is even permitted to petition the CMCR for mandamus relief, much less that he ought to do so before this Court may entertain his Petition. Review of his conviction and

---

[2] The Court doubts whether the convening authority had authority to review and approve of the contempt finding itself. The regulation says that the "convening authority may approve or disapprove all or part of the *sentence*." R.M.C. 809(d) (emphasis added). As R.M.C. 809(e) makes clear, the word "sentence" within the rule refers to the punishment (be it a fine, confinement, or both) meted upon the contemptuous person. It does not refer to the finding of contempt itself. As such, it seems plain to the Court that the convening authority has no authority to review the propriety of a contempt finding itself, but only the sentence imposed. This result is especially clear when the scope of review in R.M.C. 809(d) is compared with the general scope of review given to the CMCR in 10 U.S.C. §950f(d), which refers to both the "*finding and sentence*" (emphasis added). Regardless, whether the convening authority acted appropriately in reviewing the contempt finding itself is not relevant to the merits of General Baker's Petition.

sentence within the military commission system is over. Therefore, there is no ongoing proceeding to which this Court can defer under *Schlesinger*.

Second, even if further review within the military commission system was permitted by the rules, the respondents fail to point to the source of the CMCR's jurisdiction over any petition for mandamus relief. Section 950f, which governs review of commission findings and sentences by the CMCR, says that the CMCR may review only those cases referred to it by the convening authority under § 950c. 10 U.S.C. § 950f(c). The convening authority has not referred General Baker's case to the CMCR, and it is not clear whether it even has the power to do so under R.M.C. 809(d).[3] So § 950f cannot provide a basis for review of this case by the CMCR.

The respondents also point to the All Writs Act—a favorite of Guantanamo litigants— as a potential source of jurisdiction. *See* 28 U.S.C. § 1651(a). The All Writs Act does not itself grant the CMCR jurisdiction because the All Writs Act "is not an independent grant of appellate jurisdiction." 16 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 3932, p. 470 (2d ed. 1996) (quoted in *Clinton v. Goldsmith*, 526 U.S. 529, 534 (1999)). But "military appellate courts are among those empowered to issue extraordinary writs under the Act" so long as such a writ would be "in aid of [their] existing statutory jurisdiction." *Clinton*, 526 U.S. at 534– 35.

The respondents argue that mandamus review of General Baker's contempt conviction would be in aid of the CMCR's future appellate statutory jurisdiction over the results of Al-Nashiri's military commission. This is so, they say, because the CMCR has jurisdiction to review a final judgment of "guilty" in Al-Nashiri's case. General Baker was "held in contempt for

---

[3] And even if the convening authority could review the case, abstention would not be necessary as such referral is "only a possibility and only at some unspecified time in the future." *Obaydullah v. Obama*, 609 F.3d 444, 448 (D.C. Cir. 2010).

refusing to take actions that would directly shape the defense Al-Nashiri receives for the duration of his military commission case." (ECF No. 16 at 24–25). And because General Baker's alleged contempt relates to the quality of Al-Nashiri's defense and could arguably affect the eventual outcome, review of the substance of that contempt would aid the CMCR's jurisdiction over Al-Nashiri's case.

The Court does not see how addressing the merits of the contempt finding against General Baker would be in aid of the CMCR's future appellate jurisdiction over Al-Nashiri. Specifically, the Court does not see how any such review would actually affect the outcome of Al-Nashiri's commission. As a factual matter, Judge Spath already declared (whether rightly or wrongly) that General Baker's excusals of three of Al-Nashiri's counsel "are null and void." Nov. 1, 2017 Tr. At 10064 (ECF No. 16-1 at 78). Despite this, "[t]he two DoD civilian defense counsel and the outside learned counsel have chosen to ignore orders to appear before the commission." *Id.* Mandamus consideration of General Baker's case is unlikely to change their minds.

Further, the Court takes issue with the implications of the respondents' argument. It is true that General Baker's actions shape the defense Al-Nashiri receives in his military commission. So do a host of other things. Everything from evidentiary rulings to the trial tactics selected by remaining counsel affect the shape and potential success of Al-Nashiri's defense. But the All Writs Act is not the proper vehicle with which to obtain review of such matters. The time to address concerns about these issues with the CMCR is on a normal appeal. And the same holds true in this case. If Al-Nashiri is found guilty, his case will surely be appealed to the CMCR. At that time, the record of the contempt proceedings will be in the record of Al-Nashiri's trial. *See* R.M.C. 809(d) ("A record of the contempt proceedings shall be part of the record of the trial of the military commission during which it occurred."). The CMCR will then, in the ordinary course

of litigation, be able to take into consideration any affects that General Baker's actions may have had on Al-Nashiri's case. That court's jurisdiction over Al-Nashiri's case is not threatened at all by General Baker's Petition. Therefore, the All Writs Act does not permit the CMCR to hear a petition for mandamus relief on the basis of its jurisdiction over Al-Nashiri's proceedings.

The Court concludes that the military commission system's own rules do not provide for further review of General Baker's habeas conviction in the CMCR. Even were that not so, the Court cannot find any basis for the CMCR's jurisdiction over such review. For these reasons, the Court finds that General Baker has sufficiently exhausted his remedies within the military commission system. Therefore, the Court will not abstain from exercising jurisdiction over his Petition.

## II. The Military Commission Has Personal Jurisdiction Over General Baker to Try Him For Contempt Under 10 U.S.C. § 950t(31).

Now that the Court has established its own jurisdiction over the Petition, the Court turns to General Baker's argument that the military commission lacks personal jurisdiction over him. If the commission lacks personal jurisdiction over him, then his contempt conviction is invalid and the Court need not reach any of General Baker's other arguments.

### A. General Baker's Argument that the Commission Lacks Personal Jurisdiction over Him.

The jurisdiction of military commissions convened under Chapter 47A is set forth in 10 U.S.C. § 948d. This section is entitled "Jurisdiction of military commissions." The relevant portion of § 948d reads as follows:

> A military commission under this chapter shall have jurisdiction to try persons subject to this chapter for any offense made punishable by this chapter . . . .

17

10 U.S.C. § 948d. The exact phrase "persons subject to this chapter" is not defined, but § 948c is entitled "Persons subject to military commissions," which is closely related. Section 948c reads as follows:

> Any alien unprivileged enemy belligerent is subject to trial by
> military commission as set forth in this chapter.

*Id.* § 948c. In that section, "alien" is defined to mean "an individual who is not a citizen of the United States." *Id.* § 948a(1).

Following these sections, General Baker's argument that the military commission does not have personal jurisdiction over him is straightforward. General Baker is a citizen of the United States. Therefore, he is not an "alien." *See id.* And because he is not an alien, he is not "subject to trial by military commission as set forth in [chapter 47A]," *Id.* § 948c, and not "subject to [chapter 47A]" at all within the meaning of § 948d. Therefore, he is not subject to the jurisdiction of the military commission.

> *B. The Respondents' Argument that the Commission Does Have Personal Jurisdiction*
> *over General Baker (at Least for Contempt).*

In response, the respondents point to an interesting feature of 10 U.S.C. § 950t, which defines the crimes triable by military commission. There are 32 enumerated crimes. Thirty of them begin with the phrase "Any person subject to this chapter." *Id.* § 950t(1)–(30). But the 31st crime in the list, contempt, does not begin with that phrase. *Id.* § 950t(31). Instead, the contempt statute says that a "military commission under [chapter 47A] may punish for contempt *any person* . . . ." *Id.* (emphasis added).

This difference, the respondents argue, is significant. It suggests that the military commissions have power to punish a larger category of persons for contempt than they may punish for the first 30 enumerated crimes. While a military commission may only punish "persons subject

18

to [chapter 47A]" (i.e., alien unprivileged enemy belligerents) for the first 30 enumerated crimes, it may punish "any person" for contempt. This textual distinction would be rendered meaningless if the only persons who could be punished by a military commission at all (even for contempt) were alien unprivileged enemy belligerents subject to chapter 47A. As such, the respondents interpret § 950t(31) not only to define contempt, but also to extend the military commission's personal jurisdiction over any and all persons who may have committed contempt. Therefore, while General Baker is correct that the military commission has no personal jurisdiction to try and punish him for the first 30 offenses listed in § 950t, the military commission does have personal jurisdiction to try and punish him for contempt.

> *C. The Court Agrees that § 950t(31) Gives a Military Commission Personal Jurisdiction over Those Guilty of Contempt.*

The problem presented here is that the main statutory provisions in question—§ 948c, § 948d, and § 950t(31)—seem contradictory. Taken together, §§ 948c and 948d grant a military commission jurisdiction over only alien unprivileged enemy combatants. Section 950t(31), meanwhile, purports to give a military commission authority to try and punish "any person" for contempt. There is tension there.

In resolving this tension, the Court keeps in mind two related rules. First, it is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute . . . ." *Williams v. Taylor*, 529 U.S. 362, 364 (2000). Second, the Court is mindful that "'where Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Applying these rules to this case, it is clear that the lack of the phrase "persons subject to this chapter" in the definition of contempt should have some significance. Of the 32 crimes detailed in § 950t, 30 do have that phrase. The Court must "presume[] that Congress act[ed] intentionally and purposely in the disparate inclusion" of that phrase. *Keene Corp.*, 508 U.S. at 208.

But General Baker's view of the extent of the commission's personal jurisdiction renders this textual distinction a nullity. Under General Baker's view, the omission of the phrase "persons subject to this chapter" from the definition of contempt has no real-world impact because the personal jurisdiction of the commission, being defined exclusively by §§ 948c and 948d, is limited solely to "persons subject to this chapter." Therefore, despite the exclusion of the phrase "persons subject to this chapter" from the definition of contempt, the commission may only punish "persons subject to this chapter" for contempt. Such an interpretation renders Congress's intentional distinction meaningless and does too much violence to the statute.

Instead, the Court concludes that the best reading of the statute, in light of its text and overall structure, is that §§ 948c and 948d give the commission personal jurisdiction over alien unprivileged enemy belligerents (i.e., "persons subject to this chapter"), but that § 950t grants to the commission an extra, tiny pocket of personal jurisdiction over "any person" who commits contempt as defined by that section. In this way, § 950t does not merely define the subject matter of contempt, but also acts as a limited grant of personal jurisdiction. This interpretation does the least possible amount of violence to the statutory scheme as a whole. It preserves the commission's broad jurisdiction over alien unprivileged enemy belligerents while also giving real-world significance to a clear textual distinction. This is a preferable resolution of the tension in the statute to General Baker's.

For these reasons, the Court finds that the military commission did have personal jurisdiction over General Baker, but only for the limited purpose of determining guilt and punishment for contempt.

III.    **Judge Spath Has No Authority to Unilaterally Impose a Finding of and Sentence for Contempt.**

Section 950t of Chapter 47A clearly contemplates that contempt will be tried and punished by a military commission. The section is entitled "Crimes triable by *military commission.*" 10 U.S.C. § 950t (emphasis added). The prefatory clause of that section reads "[t]he following offenses shall be triable by *military commission* under this chapter . . . ." *Id.* (emphasis added). The text of § 950t(31) says that "[a] *military commission* under this chapter may punish for contempt . . . ." *Id.* § 950t(31) (emphasis added).

General Baker was summarily held in contempt by the unilateral action of Judge Spath. But Chapter 47A provides no explicit authorization for a military judge to make findings of or punish for contempt. As such, the only way that Judge Spath's actions can be lawful is if a unilateral action by a military judge can be considered an action of the "military commission" as that term is used in § 950t(31). The question, in other words, is whether "military judge" and "military commission" are interchangeable in that section.

The Court holds that they are not. There are numerous statutory indications showing that "military commission" cannot be understood to mean "military judge."

Chapter 47A clearly distinguishes between military judges and members of military commissions. The requirements for service as a member on a military commission are found in § 948i. The basic rule is that "[a]ny commissioned officer of the armed forces on active duty is eligible to serve on a military commission under this chapter." *Id.* § 948i(a). This section also clarifies that officers serving on a military commission are known as "members." *Id.* § 948i(b)

("When convening a military commission under this chapter, the convening authority shall detail *as members* thereof . . . .") (emphasis added).

Section 948i stands in contrast to § 948j, which sets out the qualifications for and duties of military judges. The mere fact that military judges are subject to a different set of rules from actual commission members indicates that "military commission" and "military judge" may not be read interchangeably. But the specific words in these sections reinforce this conclusion. The requirements for being a military judge are different from the requirements for being a member of a military commission. *Id.* § 948j(b) (requiring that military judges, in addition to being commissioned officers of the armed forces, be members of the bar of a federal court or the highest court of a state and also be certified as a military judge of general courts-martial). The words used in the two sections describing the respective relations of the members and the military judge to the commission are different. Section 948i describes members as "serv[ing] *on* a military commission." *Id.* § 948i(a) (emphasis added). But § 948j describes a military judge as "detailed *to* [a] military commission" and "presid[ing] *over* [a] military commission." *Id.* § 948j(a) (emphasis added). These differences strongly indicate that the military commission actually consists of the members, while the military judge is separate from and ancillary to that commission.

The duties of and rules governing the military judge also emphasize his separate, non-member status on or in relation to the military commission. For example, a military judge is not allowed to "consult with the members except in the presence of the accused . . ., trial counsel, and defense counsel." *Id.* § 948j(d). A military judge also may not "vote with the members." *Id.* § 948j(e). These prohibitions against ex parte communications with members of the military commission and voting with the members of the military commission reinforce that the military judge is not, in fact, the military commission.

These prohibitions are also common sense. They reflect the traditional barriers drawn between judges and juries in any civilian court of law. And that analogy is instructive. If a statute read that "The jury may make findings of guilt and impose a sentence in a criminal case," no reasonable jurist would, absent other explicit statutory authorization, read the statute to permit a judge presiding over that jury to make such findings and impose such sentences instead of the jury. Yet that is exactly how the respondents would have the Court read § 950t.

But that is not the end of the statutory evidence. The prohibition on military judges voting with the military commission is especially instructive in light of § 949m. Section 949m(a) reads as follows:

> No person may be convicted by a military commission under this chapter of any offense, except as provided in section 949i(b) of this title or by concurrence of two-thirds of the primary members present at the time the vote is taken.

*Id.* § 949m(a). Contempt is an offense under Chapter 47A. *See id.* § 950t (including contempt as one of the "offenses . . . triable by military commission under [Chapter 47A]"). Therefore, one can only be convicted by a military commission of contempt by concurrence of two-thirds of the primary members (except as provided in § 949i(b), which concerns plea bargains and is of no relevance to this case). As the Court has already shown, the military judge is not a "member" of a military commission and explicitly has no authority to vote with the members. And because the military judge is forbidden from taking part in the procedures that a military commission is required to go through in order to convict a person, the Court rejects any suggestion that "military commission" as the term is used in § 950t and § 950t(31) can be read to include a military judge, much less to mean a military judge to the exclusion of the members.

Finally, the Court notes that the respondents do not argue that the term "military commission" as used in § 950t(1)–(30) can be read to authorize unilateral findings of guilt and

sentencings by the military judge without the input of the members. The reason is obvious. Such an interpretation would undermine the entire military commissions system and essentially authorize bench trials for all of the crimes listed in § 950t. The Court can find no justification in the text of the statute to interpret the term "military commission" in § 950t(31) any differently than it is interpreted in § 950t(1)–(30). Instead, the repeated use of the term "military commission" in this section and throughout Chapter 47A "presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (internal quotation marks and citations omitted).

The respondents argue that the Court should defer to the rules promulgated by the Secretary of Defense interpreting the Military Commissions Act of 2009 (including the portions of that Act constituting Chapter 47A) under the doctrine of *Chevron* deference. *See generally Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Those regulations define "military commission" to include the military judge and to mean the military judge acting alone when conducting a session outside the presence of the members. R.M.C. 103(21). Those regulations also give the military judge the exclusive power to determine whether to punish for contempt and what that punishment shall be. R.M.C. 809(c).

The Court will not defer to these rules, even assuming they merit analysis under the *Chevron* framework. The first step in a *Chevron* analysis is for a court to determine whether there is an ambiguity in the statute. *Chevron*, 467 U.S. at 842–43. If "Congress has directly spoken to the precise question at issue . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. In determining whether there is ambiguity in the statute, the Court does not defer to the agency's own view of whether the statute

is ambiguous. *Nat'l Ass'n for Home Care & Hospice v. Burwell*, 142 F. Supp. 3d 119, 124 (D.D.C. 2014).

The respondents' arguments for why the statute is ambiguous all look to sources external to the text of the statute itself. For example, the respondents point to the legislative history of the Military Commissions Acts of 2006 and 2009, to comparisons with the contempt provisions and procedures in the Uniform Code of Military Justice (UCMJ), to the historical practices and policies that governed military judges' contempt powers in normal courts-martial and military commissions, and to the Secretary of Defense's own rules. None of these, however, can be used to create ambiguity in an otherwise clear text. An agency cannot be permitted to create ambiguity through its own rules and then request deference to those rules on the basis of that ambiguity. Such a system would be circular. The provisions and judicial interpretations of the UCMJ, "while instructive," are not of their "own force binding on military commissions established under this chapter." 10 U.S.C. § 948b(c). The Court does not interpret "instructive" to mean that the UCMJ may be used to create ambiguity in the text where none existed before. And legislative history, per the Supreme Court's practice, may only be used to clarify ambiguous language, not to cast doubt on the meaning of otherwise clear language. *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language."); *id.* at 574 ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").

The only textual argument that the respondents advance in favor of finding ambiguity is that Chapter 47A does not explicitly say that a military judge *cannot* hold summary, unilateral contempt proceedings. But Chapter 47A does say that, just not in those exact words. By making

contempt an offense triable by a military commission, and by requiring convictions for any offense to be made "by concurrence of two-thirds of the primary members present at the time" a vote is taken, Chapter 47A makes clear that summary, unilateral contempt convictions carried out by military judges are impermissible. 10 U.S.C. § 949m(a). Where "the statute's language is plain," that is "where the inquiry should end." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016) (internal quotation marks and citations omitted). The text of Chapter 47A is plain, and so our inquiry ends with the text. There is no basis for deference to the implementing rules.[4]

Stated simply, § 950t(31) authorizes a "military commission" to try and punish a person for contempt. Chapter 47A is clear that a military judge is distinct from the members of a military commission and that the commission is composed of the members. "Military commission" does not mean or include "military judge." Therefore, Judge Spath acted unlawfully when he unilaterally convicted General Baker of criminal contempt and sentenced him for that contempt. He usurped a power that belongs solely to the members of the commission, voting as a body. For that reason, Judge Spath's contempt findings must be vacated and the Court will grant General Baker's Petition.

As these grounds are sufficient to grant to General Baker the relief that he seeks, the Court declines to address any of the remaining arguments before it.

---

[4] Even were the text ambiguous, the particular rule at issue, R.M.C. 809, which permits (requires, in fact) military judges, acting alone, to find and punish contempt, would be unlawful as "contrary to or inconsistent with [Chapter 47A]." 10 U.S.C. § 949a(a). As the Court has noted several times, § 949m(a) requires that all convictions for any Chapter 47A offense be by vote of the members of the commission (except in the case of plea bargains). And contempt is a Chapter 47A offense. Therefore, R.M.C 809, which requires that a military judge, rather than the primary members of the military commission, find and punish contempt, is directly contrary to the requirements of Chapter 47A and is unlawful.

## Conclusion

Judge Spath summarily convicted General Baker of criminal contempt and sentenced him for that criminal contempt. Contempt is an offense under Chapter 47A. But Judge Spath's actions were unlawful because only a military commission acting through its regularly constituted members is authorized to convict a person of any offense under Chapter 47A. And a military judge is not a member of a military commission nor is he "the military commission" within the meaning of that chapter. For this reason, the Court will **GRANT** General Baker's Petition, issue the writ he requests, and vacate his conviction.

By reason of this decision, all other pending motions before the Court will be denied as moot.

**A separate order shall issue this date.**

Signed: June _____ 18 _____, 2018.

HONORABLE ROYCE LAMBERTH
UNITED STATES DISTRICT JUDGE